**AMERICAN FAMILY MUTUAL INSURANCE COMPANY,**
Appellee,

v.

Dawn S. PETERSEN, Appellant.

No. 02–1400.

Supreme Court of Iowa.

Feb. 25, 2004.

As Amended on Denial of Rehearing May 6, 2004.

Timothy M. Sweet of Beard & Sweet, P.L.C., Reinbeck, for appellant.

Ken A. Winjum, West Des Moines, for appellee.

CADY, Justice.

This appeal from a declaratory judgment primarily requires us to decide within the context of a claim for uninsured motorist benefits by an injured insured whether a tortfeasor's intentional conduct may constitute an "accident" within the meaning of the uninsured motor vehicle provision of an insurance contract and whether the conduct giving rise to the injuries to the insured arose from the use of a motor vehicle. We also consider the binding effect of a judgment against the uninsured tortfeasor. The district court entered judgment for the insurer. It held the injuries to the insured arose from the use of a motor vehicle but the uninsured motor vehicle clause did not extend coverage to the insured for injuries caused by the intentional acts of a third-party tortfeasor. On our review, we affirm the judgment of the district court in part and reverse in part.

## I. Background Facts and Proceedings.

Dawn Petersen (Petersen) was injured on July 29, 1999, after she was assaulted by her former live-in boyfriend, David Adcock (Adcock), in his Chevrolet Blazer. Petersen was a passenger in the vehicle and Adcock was the driver. The most serious injuries occurred when Petersen jumped from the moving Blazer in an effort to escape the assaultive conduct by Adcock.

Petersen and Adcock lived together for several years and had a five-year-old son. Their relationship was marked by years of abuse, and Petersen had recently moved from the home they shared. Sadly, not unlike many other women who attempt to leave an abusive relationship, Petersen was stalked and terrorized by Adcock after she left, culminating in the events of July 29.

On that fateful day, Petersen met Adcock at a restaurant in the early evening hours to discuss issues involving their son. During the conversation in the restaurant, Adcock convinced Petersen to go with him to his Blazer parked outside of the restaurant under the ruse that he had a card to give her. Petersen entered the Blazer and sat in the front passenger seat. Adcock entered and sat in the driver's seat. He started the car and rolled its windows down. Within minutes, Adcock began shocking Petersen with a stun gun. He also grabbed her around the neck. Adcock then drove from the restaurant as he continued to shock her with the stun gun.

After unsuccessfully attempting to grab the steering wheel from Adcock, Petersen climbed out of the window of the Blazer and eventually released her grip on the moving vehicle. She felt her life was in greater danger if she remained with the vehicle. Petersen sustained numerous injuries to her body when she struck the pavement of the street. The vehicle was traveling approximately forty miles per hour at the time. She also sustained injuries from the stun gun.

American Family Mutual Insurance Company (American Family) insured the Blazer by a policy of insurance in Adcock's name. The liability provisions of the policy excluded coverage for "[b]odily injury ... caused by an intentional act of ... an **insured person.**" Petersen had a separate insurance policy with American Family covering her vehicle. This policy included uninsured motorist coverage. The provision provided:

> **We** will pay compensatory damages for **bodily injury** which an **insured person** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle.** The **bodily injury** must be sustained by an **insured person** and must be caused by accident and arise out of the **use** of the **uninsured motor vehicle.**

Petersen sued Adcock on March 3, 2000, for the injuries she received from the incident on July 29, 1999. Adcock promptly filed a pro se answer denying the claim. However, after Adcock failed to respond to discovery requests and failed to appear for a hearing on sanctions, the district court entered a default against him on November 14, 2000. Following a hearing on damages on February 8, 2001, the district court entered judgment against Adcock for $52,133.14 in compensatory damages and $35,000 in punitive damages.

American Family was not informed of the lawsuit against Adcock until December 13, 2000, and was not notified of the hearing on damages until February 1, 2001, one week prior to the hearing. American Family denied coverage under both insurance policies and elected not to seek intervention in the lawsuit to participate in the

damage hearing. After the final judgment was entered, Petersen requested American Family pay her damages pursuant to the uninsured motorist clause of her insurance policy.

American Family filed a petition for declaratory relief. It claimed there was no coverage for any damages sustained by Petersen under either American Family policy. It also claimed it was not bound by the judgment obtained by Petersen against Adcock. Petersen asked that the court declare coverage under both policies and find the default judgment binding on American Family.

The district court considered the petition on stipulated facts. It determined there was no coverage under the American Family policies. It first found that the intentional act exclusion precluded coverage under Adcock's policy. It then found there was no coverage under the uninsured motorist provision of Petersen's policy because Petersen's injuries were not "caused by accident." It did not address the question whether the judgment was binding on American Family. The district court later denied Petersen's motion to enlarge the ruling to fully address all issues.

Petersen appeals and raises two issues. First, she asserts that the question whether an "accident" occurred under the uninsured motor vehicle provision should be considered from the viewpoint of the injured insured, not the uninsured tortfeasor. From her viewpoint, Petersen claims the incident was unexpected and unintended, which makes her injuries accidental. Second, she argues American Family must

be bound by the prior judgment against Adcock in a claim under the uninsured motorist clause of her insurance policy because American Family failed to intervene in the action after receiving notice of the damage hearing. American Family responds that both grounds it asserted at trial can support the decision of the district court. It also argues that the doctrines of res judicata and collateral estoppel preclude enforcement of the judgment against it in the event coverage exists under the uninsured motorist clause.

## II. Scope of Review.

■■■■ A declaratory judgment action tried at law limits our review to correction of errors at law. *United Fire & Cas. Co. v. Shelly Funeral Home, Inc.*, 642 N.W.2d 648, 651 (Iowa 2002). We are bound by well-supported findings of fact, but are not bound by the legal conclusions of the district court. *Id.* Moreover, the construction and interpretation of a contract of insurance are matters of law for the court, and we are not bound by the interpretation and ruling of the district court. *Ill. Nat'l Ins. Co. v. Farm Bureau Mut. Ins. Co.*, 578 N.W.2d 670, 671 (Iowa 1998).

## III. Uninsured Motorist Coverage.

The uninsured motorist (UM) coverage of an insurance policy typically applies when four requirements are satisfied.[1] Two such requirements are that the bodily injury be caused by "accident" and that the bodily injury arise out of the "use" of the uninsured vehicle. These two requirements form the foundation for this appeal and require us to decide the meaning of

---

1. UM coverage is mandated when: (1) the injured person is an insured under the insurance policy provisions; (2) the injured person is "legally entitled to recover damages from the owner or operator of an uninsured motor vehicle;" (3) the injury to the insured was

"caused by accident;" and (4) the injury arose "out of the ownership, maintenance, or use" of an uninsured motor vehicle. Iowa Code § 516A.1 (2001). These requirements are found both in our statute and the particular insurance policy at issue in this case.

each phrase within the context of UM coverage.

 Before separately addressing each requirement, we recognize that our fundamental task at hand is to interpret the language of the insurance policy. *See Gen. Cas. Co. of Wis. v. Hines*, 261 Iowa 738, 745, 156 N.W.2d 118, 122 (Iowa 1968) (an automobile insurance policy is a contract and is governed by rules applicable to contracts). In doing so, "we strive to ascertain the intent of the parties at the time the policy was sold." *Ferguson v. Allied Mut. Ins. Co.*, 512 N.W.2d 296, 299 (Iowa 1994). "We ordinarily determine [this] intent from the language of the policy itself unless the policy is ambiguous." *Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Farmland Mut. Ins. Co.*, 568 N.W.2d 815, 818 (Iowa 1997). An ambiguity exists when, after application of our relevant rules of interpretation, a genuine uncertainty results as to which of two or more meanings is proper. *LeMars Mut. Ins. Co. v. Joffer*, 574 N.W.2d 303, 307 (Iowa 1998). When two reasonable interpretations exist, the policy is construed most favorably to the insured. *United Fire & Cas. Co. v. Victoria*, 576 N.W.2d 118, 120–21 (Iowa 1998); *see also State Auto. & Cas. Underwriters v. Hartford Accident & Indem. Co.*, 166 N.W.2d 761, 763 (Iowa 1969) (when policy is susceptible to two interpretations, one that sustains coverage and one that does not, we favor the construction that provides coverage). With these concepts in mind, we separately address each requirement.

### IV. "Caused by Accident" Requirement.

The meaning of the term "accident" within the context of UM coverage and, in particular, whether the term can include intentional acts of an uninsured tortfeasor, is an issue of first impression in Iowa. Other jurisdictions have answered the question differently depending upon whether an "accident" is viewed from the perspective of the injured insured or the uninsured tortfeasor. A majority of jurisdictions consider the question from the perspective of the injured insured, and conclude an intentional act of an uninsured tortfeasor may nevertheless be an "accident" under a UM provision as long as it was unprovoked by the injured insured. *See State Farm Mut. Auto. Ins. Co. v. McMillan*, 925 P.2d 785, 793 (Colo.1996) (collecting cases); *Wendell v. State Farm Mut. Auto. Ins. Co.*, 293 Mont. 140, 974 P.2d 623, 629–30 (1999) (same); *see also* 2 Irvin E. Schermer, *Automobile Liability Insurance* § 42.03[8], at 42–23 (3d ed.1995). The rationale for viewing the incident causing the injury from the standpoint of the victim has been summarized in one well-known treatise as follows:

> *First* ... unless the tortious conduct of the uninsured or unidentified motorist was provoked by the injured person, the events and the injuries resulting from intentional acts are indistinguishable from those that result from negligent acts. In other words, when injuries are viewed from the vantage point of an injured person, the cause of the injuries is no less fortuitous than the situation in which a person is injured as a result of the negligent operation of an uninsured vehicle.

> *Second,* since uninsured motorist insurance is a first party coverage, the insurance provides no benefits—directly or indirectly—to the tortfeasor. Indeed, if the tortfeasor is financially responsible, the insurer which has paid uninsured motorist insurance benefits may seek reimbursement for payments made to a claimant. Therefore, the claim for indemnification under uninsured motor-

ist insurance is readily distinguished from situations involving a question about whether liability insurance covers claims for damages that result from intentional torts.

*Third,* the justifications for not indemnifying the insured who intentionally commits a tortious act relate to deterrence or punishment: considerations that do not apply to the payment of first party, uninsured motorist insurance claims. Uninsured motorist insurance benefits paid to an injured person do not reduce the possibility that the tort system or the criminal law system will operate either (a) to punish the tortfeasor or (b) to influence the conduct of the tortfeasor who caused the loss which is indemnified by the insurance or of other potential tortfeasors.

*Fourth,* the enactment of uninsured motorist insurance statutes throughout the country, which mandate either that the insurance be offered to all motor vehicle insurance purchasers or included in all motor vehicle insurance policies, reflects the importance attached to providing indemnification for innocent traffic victims who are injured by financially irresponsible or unidentified motorists.

1 Alan I. Widiss, *Uninsured and Underinsured Motorist Insurance* § 10.2, at 655–56 (rev.2d ed.1999) (footnote omitted) [hereinafter Widiss].

The minority view generally defines the term "accident" from the perspective of the uninsured tortfeasor. *See McMillan,* 925 P.2d at 793 (collecting cases); *Wendell,* 974 P.2d at 630 (same). The courts following this position point out that the purpose of the UM coverage is to provide the injured insured with the same protection that liability insurance coverage would have provided if the uninsured motorist had been insured. *See Roller v. Stonewall Ins. Co.,* 115 Wash.2d 679, 801 P.2d 207,

210–11 (1990). Accordingly, it is argued that UM provisions should not be interpreted to cover intentional acts of an uninsured tortfeasor because liability policies do not cover injuries caused by intentional conduct of an insured. *Id.* In other words, an injured insured should not be put in a better position by virtue of being injured by an uninsured motorist than if injured by an insured motorist. *Id.* at 210. Some of the courts following the minority view also express concern that utilizing the perspective of the victim to determine whether an incident is accidental would essentially write the term "accident" out of the policy and render the requirement ineffectual because most all incidents involving injuries would be "accidents." *State Farm Mut. Ins. Co. v. Pitman,* 148 N.H. 499, 809 A.2d 1280, 1282–83 (N.H.2002) (finding minority view reasonable but following majority view). Another way the minority courts resolve the question is to refrain from utilizing either perspective, and consider the existence of an "accident" by applying its commonly understood meaning. *Roller,* 801 P.2d at 210. Under this approach, an "accident" is not a subjective term and the perspective of the insured or tortfeasor is irrelevant. *Id.* "Either an incident is an accident or it is not." *Id.*

▪ In interpreting the "caused by accident" language of the UM provision in this case, we first observe that the insurance policy fails to define the word "accident." When a word is left undefined in a policy, we give it the ordinary meaning a reasonable person would understand the word to mean. *Farm & City Ins. Co. v. Potter,* 330 N.W.2d 263, 265 (Iowa 1983). If two reasonable interpretations exist, we adopt the one favoring the insured. *Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd.,* 568 N.W.2d at 818. However, the mere disagreement by the parties over the meaning of a term, or

perhaps even a disagreement among courts, does not by itself establish an ambiguity, although we view the disagreement of courts in this matter as a strong indication of an ambiguity. *See Morgan v. Am. Family Mut. Ins. Co.*, 534 N.W.2d 92, 99 (Iowa 1995) (disagreement by parties does not, standing alone, establish an ambiguity), *overruled on other grounds by Hamm v. Allied Mut. Ins. Co.*, 612 N.W.2d 775, 784 (Iowa 2000).

■ To determine the existence of an ambiguity, we begin by examining the purpose and intent of our UM statute. Although the intent of the parties controls the resolution of the issue, it is recognized that our UM statute forms "a basic part of the policy" and must be considered to effectuate the parties' intent. *Hollingsworth v. Schminkey*, 553 N.W.2d 591, 595 (Iowa 1996); *see also Lee v. Grinnell Mut. Reinsurance Co.*, 646 N.W.2d 403, 406 (Iowa 2002) ("The terms of the policy are to be construed in light of the purposes and intent of the applicable statute."); *Veach v. Farmers Ins. Co.*, 460 N.W.2d 845, 847 (Iowa 1990) (same). Where a statute closely guides the contract between the parties, as in UM coverage as well as many other provisions in insurance policies, "it is to be presumed that the parties contracted with the intention of executing a policy satisfying the statutory requirements, and intended to make the contract to carry out its purpose." 7 Lee R. Russ, *Couch on Insurance* § 109:17, at 109–29 (3d ed.1995) (footnotes omitted) [hereinafter Couch]; *see also Mortensen v. Heritage Mut. Ins. Co.*, 590 N.W.2d 35, 39 (Iowa 1999) (provisions of Iowa Code chapter 516A are read into insurance policies).

The language of the UM clause of the insurance policy closely tracks the language of our uninsured motorist statute found in Iowa Code section 516A.1 (2001). This section requires all motor vehicle insurance policies that insure "against liability for bodily injury or death arising out of the ownership, maintenance, or use of a motor vehicle" to provide coverage:

> for the protection of persons insured under such policy who are legally entitled to recover damages from the owner or operator of an uninsured motor vehicle ... because of bodily injury ... caused by accident and arising out of the ownership, maintenance, or use of such uninsured ... motor vehicle.

*Id.*

We have previously traced the concept of UM coverage back to a standard endorsement promulgated by the National Bureau of Casualty Underwriters in 1956, initiated as a response to the growing trend among the states to require liability insurance. *Douglass v. Am. Family Mut. Ins. Co.*, 508 N.W.2d 665, 666 (Iowa 1993) (citing Dag E. Ytreberg, Annotation, *Insured's Right to Bring Direct Action Against Insurer for Uninsured Motorist Benefits*, 73 A.L.R.3d 632, 636–37 (1976)), *overruled on other grounds by Hamm*, 612 N.W.2d at 784. The idea was not only to require all motorists to carry liability insurance, but to further close the gap between motor vehicle financial responsibility and compulsory insurance by providing financial compensation to innocent persons injured by the wrongful acts of those motorists who were uninsured. *See* Ytreberg, 73 A.L.R.3d at 636–37. In *Douglass*, we indicated that the purpose of a UM provision was "to provide to the victim of an accident the same protection that the victim would have had if the negligent tortfeasor had had minimum insurance coverage." 508 N.W.2d at 667.

The specific purpose of UM coverage identified in *Douglass* could be viewed to support the notion that an accident in the context of UM coverage excludes intentional acts of the uninsured tortfeasor.

*See* Ytreberg, 73 A.L.R.3d at 636–37. This is based on the concept that the intentional act would have prevented the insured from recovering from the tortfeasor insurer if the tortfeasor had maintained the required minimum insurance coverage. *See Dolan v. State Farm Fire & Cas. Co.*, 573 N.W.2d 254, 257 (Iowa 1998) (assault victim had no recovery from homeowner's insurer because of exclusion for insured homeowner's intentional acts). This view appears compatible with the position of the minority of the courts who find injuries caused by intentional acts of the tortfeasor to be outside the scope of the term "accident" because the injured insured would not have been protected under the tortfeasor's liability policy.

■ However, we have also viewed our UM statute to be more than a mere substitution for a tortfeasor's noncompliance with the financial responsibility laws. We have previously explained " '[t]he purpose of uninsured motorist coverage is to ensure minimum compensation to victims of uninsured motorists.' " *Hamm,* 612 N.W.2d at 779 (citation omitted). We have also said that our "legislature intended to assure protection to an insured against motorists whose liability to the insured is not covered." *Rodman v. State Farm Mut. Auto. Ins. Co.*, 208 N.W.2d 903, 909 (Iowa 1973). Neither of these purposes necessarily suggests that UM coverage is limited, as liability coverage is limited, to claims involving unintentional acts of the uninsured tortfeasor.

We acknowledge our prior cases have adopted a "narrow coverage" view of uninsured-motorist coverage, in contrast with a "broad coverage" view of underinsured-motorist coverage. *Veach,* 460 N.W.2d at 848; *see also McClure v. Northland Ins. Co.*, 424 N.W.2d 448, 449–50 (Iowa 1988). However, our narrow-coverage view applies to the duplication of benefits from

other sources. *Veach,* 460 N.W.2d at 848; *McClure,* 424 N.W.2d at 449. It means we traditionally subtract "from the policy limit any recovery from other sources" in awarding UM coverage. *McClure,* 424 N.W.2d at 449; *see also McClure v. Employers Mut. Cas. Co.*, 238 N.W.2d 321, 329–30 (Iowa 1976) (insurer would be allowed to deduct workers' compensation benefits from UM policy limits to avoid duplicative award). The objective of the statute is to restrict the "maximum recovery to the minimum required amount." *Lemrick v. Grinnell Mut. Reins. Co.*, 263 N.W.2d 714, 719 (Iowa 1978). This case, however, is not about duplication of benefits, and the "narrow coverage" approach taken in our prior cases does not restrict our consideration of the meaning of an "accident" in determining whether coverage exists in the first place. Accordingly, our stated purposes of UM coverage are generally consistent with the view recognized in other jurisdictions that UM coverage essentially exists to protect insureds "who have been injured by financially irresponsible motorists, so that such coverage resembles an accident policy for the victim." Annotation, *Coverage Under Uninsured Motorist Clause of Injury Inflicted Intentionally,* 72 A.L.R.3d 1161, 1164 (1976); *accord Wendell,* 974 P.2d at 629.

■ We next turn to consider the insurance policy as a whole, including other terms of UM coverage. *See Morgan,* 534 N.W.2d at 99; *Bates v. United Sec. Ins. Co.*, 163 N.W.2d 390, 397 (Iowa 1968) (courts consider contract as a whole). The intention of the parties to a contract must be derived from the language of the entire contract. *Schlotter v. Leudt,* 255 Iowa 640, 645, 123 N.W.2d 434, 438 (1963).

The policy defines a "uninsured motor vehicle" to include not only an uninsured vehicle, but also a motor vehicle that is "insured by a bodily injury liability ...

policy at the time of the accident but the company denies coverage." This definition reveals that UM coverage applies not only when the tortfeasor's motor vehicle is "not insured by a bodily injury liability ... policy" but also when, as in this case, the motor vehicle is insured but the insurer denies coverage. Clearly, the UM provisions contemplate coverage to include situations, like this case, when the victim could not recover under the tortfeasor's liability policy due to an exclusion. Moreover, the policy identifies the circumstances when a vehicle will not be considered an uninsured motor vehicle. These circumstances did not include denial of coverage for intentional conduct. *See Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd.,* 568 N.W.2d at 817 (insurer has duty to define limitations in clear and explicit terms). The exclusions from the coverage section of the policy also did not identify intentional conduct of the tortfeasor. *See Wendell,* 974 P.2d at 630–31 (noting that some cases denying coverage are distinguishable based on the fact the policies being construed contained express exclusions for intentional conduct). There is nothing in the policy that specifically distinguishes between intentional acts and negligent acts within the UM provisions relating to the phrase "caused by accident." *See McMillan,* 925 P.2d at 792–93 (construing similar policy language).

We next review the definition of the term "accident" in an effort to ascertain its reasonable meaning. We have previously considered the definition of "accident" in the context of the liability provisions of an automobile insurance policy. In *Potter,* we held a collision that occurred after the insured driver was unable to stop her vehicle was an "accident" under the terms of a liability policy, even though the insured intentionally severed the brake lines of the vehicle. We reached this conclusion because the insured nevertheless attempted to avoid the collision after the brakes failed. *See Potter,* 330 N.W.2d at 267. In reaching this holding, we recognized that the meaning of an "accident" in a liability policy should normally be viewed "from the viewpoint of the tortfeasor" because the liability policy insures the tortfeasor, not the victim. *Id.* at 265. We also acknowledged the existence of authority supporting an interpretation of an "accident" from the standpoint of the injured victim, but found it unnecessary to resolve the split of authority. *Id.* We also found it unnecessary to determine if the word "accident" excluded an event in which the acts of the tortfeasor intended to harm others or the property of others. *Id.* at 266. These questions went unanswered because, despite the evidence that the tortfeasor intended to set in motion the events that caused the harm, the tortfeasor never intended to cause damage to anyone, but instead attempted to avoid the collision. *Id.* at 266–67. Notwithstanding, we quoted with approval from *Comfort v. Continental Casualty Co.,* 239 Iowa 1206, 1207–08, 34 N.W.2d 588, 588–89 (1948):

> [A]n 'accident' is an event which, under the circumstances, is unusual and unexpected *by a person to whom it happens;* the happening of an event without the concurrence of the will of the person by whose agency it is caused.

We also considered the definition of an "accident" in the context of a premise liability policy in *Central Bearings Co. v. Wolverine Insurance Co.,* 179 N.W.2d 443 (Iowa 1970). In this case, we recognized "the futility of attempting an all-inclusive definition and underline[d] the necessity of interpreting the term within the context of the document in which it is used." *Id.* at 448. In the context of premises liability insurance, we held that the common, reasonable meaning of an "accident" was "a misfortune with concomitant damage to a

victim." *Id.* This approach was based on the accepted view that an accident referred to " 'an undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character.' " *Id.* As in *Potter,* we rejected the notion that an accident merely meant "the negligence which eventually results in [the] misfortune." *Id.*

Most recently, we considered the definition of an "accident" in *Austin v. CUNA Mutual Life Insurance Co.,* 603 N.W.2d 577 (Iowa 1999). In *Austin,* we held that an "accident" in the context of an accidental injury and death policy did not include death from surgery for a medical condition not itself the result of an underlying accident. 603 N.W.2d at 580. We indicated the term "accident" generally encompassed a sudden and unexpected event, but ultimately excluded injuries from the treatment of a medical condition from the definition of an accident by considering the question from the viewpoint of a "person on the street." *Id.* at 578–80. As in *Central Bearings Co.,* we found the definition of an "accident" was tied to the context of the situation. *See id.*

Two important points emerge from our prior cases. First, no single common definition of an "accident" applies to all types of insurance. Second, while we consider an "accident" to be an unusual and unexpected event, we have indicated that the event can be viewed through the lens of the tortfeasor, victim, and even a fictitious third party. Thus, these cases help expose the ambiguity that can arise from the use of the word "accident." Nevertheless, none of our prior cases have accepted the position argued in this case that an "accident" takes place when the tortfeasor intended to harm the person or property damaged. *See Potter,* 330 N.W.2d at 266 (suggesting the situation would not be an accident in the context of a liability policy). Thus, it may be reasonable to define the term to exclude such a situation. On the other hand, it is also reasonable to include such a situation based on our recognition that the term must be interpreted in the context of the type of insurance at issue and our willingness to consider the viewpoint of the victim in determining the existence of an "accident." Moreover, the rationale for our general tendency to view an accident from the viewpoint of the tortfeasor in the case of a liability policy is found in the fact that liability policies provide insurance for the tortfeasor, not the victim. To the contrary, UM coverage provides insurance to the victim, not the tortfeasor. Thus, we find no reason to reject the viewpoint of the victim to define an "accident" for purposes of UM coverage.

██ Liability coverage involves third-party coverage and exists as a form of indemnification to protect the insured from paying for damages the insured causes to others. In contrast, UM coverage is first-party coverage that serves not to indemnify, but to compensate the insured for injuries by uninsured motorists. *See Wendell,* 974 P.2d at 633 (discussing generally the nature of UM insurance in the context of the insurer's claim of non-compensability). Clearly, the social policy of preventing an injured insured from obtaining indemnification based upon intentional wrongs is not implicated in the context of UM coverage. *Redden v. Doe,* 357 So.2d 632, 633–34 (La.Ct.App.1978). Thus, this policy should not be used to help justify the denial of UM coverage for intentional acts. It simply does not apply to first-party coverage and innocent victims. *See Abraham v. Raso,* 183 F.3d 279, 298 (3d Cir.1999); *Wendell,* 974 P.2d at 631; *Shaw v. City of Jersey City,* 174 N.J. 567, 811 A.2d 404, 409 (2002).

We also think a distinction between intentional and negligent acts of an uninsured tortfeasor within the context of UM

coverage would lead to rather absurd and unintended results for blameless injured insureds. *See McMillan,* 925 P.2d at 794 n. 12. It would be unfair for an insured who has suddenly and unexpectedly been injured by an uninsured motorist to be denied UM coverage simply because the conduct of the uninsured motorist happened to be intentional. Instead, it would be logical for insured motorists to expect UM coverage without regard to negligence or intentional conduct of the tortfeasor. *See Pitman,* 809 A.2d at 1282. Viewed from the eyes of an innocent, victimized insured, injuries sustained from negligent acts of another are no less fortuitous than injuries resulting from intentional acts. *See Wendell,* 974 P.2d at 630.

We conclude the term "accident" under a UM provision of an insurance policy can include the situation in which the injuries are caused by intentional conduct of an uninsured tortfeasor. The term is ambiguous due to the variant viewpoints of the participants to the event, and we consequently construe ambiguous terms in favor of coverage. Accordingly, we believe the term can properly be viewed from the perspective of a blameless insured. We think the important aspect of the definition is found in the element of surprise and misfortune, and these aspects of an event are still present when one party to the event had no intent to harm another or property of another, even though another party had such an intent. This approach is not inconsistent with our prior cases, but simply recognizes that an "accident" can occur when only one party to the event had the intent to harm the other, just as when neither party had any intent. This is consistent with our ap-proach that an accident is " '[a]n event which, under the circumstances, is unusual and unexpected by a person to whom it happens.' " *Comfort,* 239 Iowa at 1207, 34 N.W.2d at 588; *accord Weber v. IMT Ins. Co.,* 462 N.W.2d 283, 287 (Iowa 1990). This approach is also consistent with the nature and purpose of UM coverage in this state, as well as the language of the UM provision at issue. Additionally, it is compatible with the other doctrines governing insurance policies, and the reasonable expectations of the insured. Similarly, this approach falls in line with the majority rule in other jurisdictions.

Based on the undisputed facts and arguments of the parties, Petersen did not intend or provoke the injuries caused by Adcock's sudden and unexpected assault. Accordingly, the incident causing injuries to Petersen was an "accident" under the UM provision of the policy.[2]

## V. "Arising Out of the … Use of an Uninsured Motor Vehicle."

We have previously considered the meaning of the phrase "arising out of" in the context of UM provisions of an insurance policy substantially identical to the UM provision at issue in this case. In *Hollingsworth,* we indicated the phrase should be broadly construed and that it only requires "some causal relationship between injury and risk for which coverage is provided." 553 N.W.2d at 595 (quoting *Kalell v. Mut. Fire & Auto. Ins. Co.,* 471 N.W.2d 865, 867 (Iowa 1991)). While this standard requires something less than the traditional concept of "proximate cause" in the context of UM coverage, it requires something more than the mere fact that

**2.** American Family made no argument that Petersen's own act in jumping from the vehicle was an intentional cause of her injuries. *See Kirkpatrick v. AIU Ins. Co.,* 204 F.Supp.2d 850, 855–56 (E.D.Pa.2002) (plaintiffs acted on adrenaline and spontaneously in reaction to carjacking and did not intend to cause harm to themselves).

the vehicle was the situs of the injury. *Id.* at 595–96.

From an analytical standpoint, we observe that the "arising out of" phrase is tied directly to the phrase "use of the vehicle." Nevertheless, these two phrases actually require separate inquiries. *See* 8 Couch § 119:37, at 119–57 ("[T]he concepts of use and legal cause should be analyzed separately, avoiding the traditional proximate cause concepts."). This means the use of the vehicle at the time of the injury must not only be a contemplated use and inherent in the purpose and nature of vehicles, but the use must be causally related to the injury. *See Johnson v. State Farm Mut. Auto. Ins. Co.*, 190 W.Va. 526, 438 S.E.2d 869, 872–73 (1993) ("Use" "must be foreseeably identifiable with the normal use of the vehicle" as a vehicle.); *see also Detroit Auto. Inter–Insurance Exch. v. Higginbotham*, 95 Mich.App. 213, 290 N.W.2d 414, 418–19 (Mich.Ct.App.1980). Like the "arising out of" phrase, the term "use" is broad, but not so broad as to embrace acts independent of the operation of a vehicle. *See* 1 *No Fault and Uninsured Motorist Automobile Insurance* § 9.10[2], at 9–20 to –22 (MB 2000). The vehicle must be more than the site of the tortious conduct. Widiss § 11.5, at 687.

■ The district court found UM coverage applied because Petersen was a passenger in the uninsured vehicle being driven by Adcock, and she was injured while attempting to escape from the vehicle to avoid the assaultive actions of Adcock. American Family asserts the vehicle served as nothing more than the situs of a crime, and the cause of Petersen's injuries was the criminal acts of Adcock and the contact of her body with the pavement of the street after she jumped from the vehicle.

We agree with American Family that the vehicle was merely the situs of the

initial assault perpetrated on Petersen while it was in the parking lot. *See U.S. Fidelity & Guar. Co. v. Lehman*, 579 So.2d 585, 586 (Ala.1990) (stabbing of passenger did not arise out of "use" of vehicle under uninsured motorist provision of policy even though the injury occurred while vehicle was moving). However, during the course of the efforts by Petersen to extract herself from the subsequent assaults, the vehicle was used as a means of transportation, clearly a contemplated use. Thus, the use of the vehicle was causally related to the injuries she sustained when she jumped from the vehicle. Under these circumstances, the use of the vehicle became a causal factor of her injuries.

We acknowledge the causal link between the use of the vehicle and the injuries suffered can be difficult to establish when intentional acts or crimes are involved. *See generally* Larry D. Scheafer, Annotation, *Automobile Liability Insurance: What Are Accidents or Injuries "Arising Out of Ownership, Maintenance, or Use" of Insured Vehicles*, 15 A.L.R.4th 10, 17 (1982) (noting prefatorily the general difficulty in determining whether the required causal relationship can be established in various case settings). However, intentional acts and crimes do not necessarily preclude recovery. *See id.* Additionally, this case involved more than a crime, and included conduct of the passenger in reacting to the crime. We conclude the evidence supported the finding of the district court.

## VI. Binding Effect of the Judgment.

The final issue on appeal is whether American Family may relitigate the issue of tort liability and damages. The district court passed upon the issue after finding there was no UM coverage under the policy. Because we determine there was cov-

erage, we address the issue presented and preserved by American Family at trial.

We begin by turning to the language of the insurance policy. Under the uninsured motorist provision, American Family was obligated to pay damages for bodily injury which the insured "is legally entitled to recover" from the uninsured motorist or owner. Petersen argues the prior default judgment obtained against Adcock establishes her legal entitlement to recover and requires American Family to pay the damages specified in the judgment pursuant to the terms of the policy. American Family attempts to avoid the policy language by relying upon the doctrines of res judicata and collateral estoppel. It argues the prior judgment obtained by Petersen against Adcock cannot be used against it because it was not a party to the action and had no duty to defend Adcock, had inadequate notice of the proceedings, and the judgment did not constitute an actual litigation of the same issues that would be presented in an uninsured motorist claim. American Family relies secondarily on the policy provision requiring the insured to give notice of any suit against the uninsured motorist and to obtain the insurer's "written consent to be bound by any resulting judgment."

In considering the binding effect of the judgment, we are mindful that the

issue is presented only in the context of an action to enforce the UM provisions of an insurance policy requiring the insurer to pay the insured damages which the insured "is legally entitled to recover" from the uninsured motorist. Consequently, the binding effect of the tort judgment at issue in this case is not necessarily governed by the doctrine of res judicata and collateral estoppel; the language of the contract between the parties is the primary source of the parties' respective rights. *See generally* 2 Widiss § 28.12, at 553–54. If an insured establishes legal entitlement to damages against an uninsured motorist, then the insurer is contractually obligated to pay the insured damages as specified in the insurance policy. An insured generally satisfies the "legally entitled to recover" condition of UM coverage when a valid judgment has been entered against the uninsured motorist.[3] *See Mizer v. State Auto. & Cas. Underwriters*, 195 N.W.2d 367, 371 (Iowa 1972); *see also Handley v. Farm Bureau Mut. Ins. Co.*, 467 N.W.2d 247, 250 (Iowa 1991) (stating in dicta that an insurer may be bound by a determination of damages in a trial against a tortfeasor).

Although a valid judgment can establish a legal entitlement to recover for the purposes of UM coverage, the UM coverage provisions impose other conditions that

**3.** The "legally entitled to recover" requirement means the insured has the burden to prove the uninsured motorist was liable and the extent of the damages. This burden can be satisfied either in an action against the uninsured motorist or in an action against the insurer. *See Leuchtenmacher v. Farm Bureau Mut. Ins. Co.*, 461 N.W.2d 291, 294 (Iowa 1990) (a lawsuit against the tortfeasor is not a condition precedent to a UIM claim). In fact, it is recognized that an insured with a claim against an uninsured motorist can pursue the matter in four ways. *See Allstate Indem. Co. v. Brown*, 696 N.E.2d 92, 95 (Ind.Ct.App.

1998); *see generally* Dag E. Ytreberg, Annotation, *Insured's Right to Bring Direct Action Against Insurer for Uninsured Motorist Benefits*, 73 A.L.R.3d 632, 635 (1976) (footnote omitted) (collecting and discussing cases "which deal with the right of an insured under an uninsured motorist provision to bring an action directly against his insurer without first suing and obtaining judgment against the uninsured tortfeasor"). *But see* 7A Am.Jur.2d *Automobile Insurance* § 602 (1997) (noting that some courts make a prior action against the uninsured motorist a prerequisite for initiating a suit against the insurer for UM benefits).

could require relitigation of the issues of liability and damage in a claim for UM benefits. First, the policy in this case limits recovery to bodily injury caused by accident and "aris[ing] out of the use" of the uninsured vehicle. Second, the policy requires the insured to "notify" the insurer of a suit against an uninsured motorist to determine liability or damages, and further provides that the insurer is not bound by any judgment without its "consent" to the suit.

**** Initially, we recognize that some of the damages awarded under the judgment represent bodily injuries suffered by Petersen that were not covered under the policy. Although the most serious injuries arose from the use of the vehicle, the initial injuries from the assault did not arise from the use of the vehicle. Thus, the damages awarded under the judgment cannot be used to establish the damages under the policy. The remaining question is whether the issue of liability must also be relitigated based on the claim by American Family of inadequate notice. (Because we find this issue dispositive, we do not consider the effect of the policy's consent-to-sue provision.)

**** It is generally recognized that a notice-of-suit clause in a UM policy of insurance is enforceable by the insurer and that the insurer is not bound by a judgment in a tort action against an uninsured motorist if the insurer did not receive adequate notice of the suit. *See generally* 2 Widiss § 28.12, at 545–58. Notice to the insurer is needed to give the insurer the opportunity to seek intervention in the tort action so that it can protect its potential interests and prevent any collusive judgments. It would also make it more likely for the parties to reach a resolution of all issues in a single proceeding.

**** The parties in this case agree that notice was given, but dispute whether it was timely and adequate under the circumstances. The district court made no findings on the issue and the stipulated facts and other documents submitted to the district court did not address the circumstances bearing on the adequacy or inadequacy of the notice provided. Moreover, there was no evidence concerning the issue of prejudice to the insurer. When provisions of an insurance policy establish conditions precedent to coverage, "an insured must show substantial compliance with [those] conditions." *Simpson v. United States Fid. & Guar. Co.,* 562 N.W.2d 627, 631 (Iowa 1997). However, the failure to comply with the condition can be excused if it does not result in prejudice to the insurer. *Id.* at 631–32.

The record in this case is insufficient to establish substantial compliance with the notice provision. Notice to an insurer of a pending lawsuit against an uninsured tortfeasor after entry of judgment on liability would ordinarily be inadequate to fully protect the interests of the insurer, and the minimal record in this case does not allow a contrary conclusion or a conclusion that the insurer was not prejudiced by the notice provided. Accordingly, American Family is entitled to a declaratory judgment that the default judgment entered against Adcock is not binding on American Family.

## VII. Conclusion.

The injury to Petersen was both caused by accident and arose out of the use of an uninsured motor vehicle. The district court erred in concluding the injury was not caused by accident. In addition, the insurer is not bound by the judgment entered in the insured's suit against the uninsured motorist.

**AFFIRMED IN PART AND RE-VERSED IN PART.**

All justices concur except WIGGINS, J., who takes no part.