## IN THE COURT OF APPEALS OF IOWA

No. 15-0487
Filed July 27, 2016

**PENNIE CARROLL,**
        Plaintiff-Appellee,

**vs.**

**REO, L.L.C., d/b/a RE/MAX OPPORTUNITIES, INC., and its Successors in Interest, DS VENTURES, L.L.C., d/b/a RE/MAX OPPORTUNITIES, INC.,**
        Defendants-Appellants.
_____

Appeal from the Iowa District Court for Polk County, Lawrence P. McLellan, Judge.

RE/MAX appeals the district court's finding that a liquidated damages clause was an unenforceable penalty clause. **AFFIRMED.**

David A. Morse of Rosenberg & Morse, Des Moines, for appellants.

Gregory G.T. Ervanian of Graham, Ervanian & Cacciatore, L.L.P., Des Moines, for appellee.

Considered by Vogel, P.J., Potterfield, J., and Scott, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**SCOTT, Senior Judge.**

REO, LLC, d/b/a Re/Max Opportunities Inc., and its successors in interest, DS Ventures, LLC, d/b/a Re/Max Opportunities (RE/MAX) appeal the district court's finding that a liquidated damages clause was an unenforceable penalty clause. Specifically, RE/MAX argues the district court (1) impermissibly placed the burden on RE/MAX to establish the liquidated damages clause was not a penalty clause and (2) erred in analyzing the reasonableness of the damages by comparing them to the actual provable loss at the time of the breach instead of the anticipated loss at the time of the contract. We affirm.

## I. Background Facts and Procedure

Pennie Carroll is a real estate agent who, in 2010, began working for RE/MAX, a real estate brokerage, pursuant to an Independent Contractor Agreement (ICA). Dennis Liberty and Stephanie VanDerKamp are the owners of RE/MAX.

Paragraph 7.B. of the ICA provides the means by which a party may terminate the agreement:

> **B. TERMINATION.** This Agreement may be terminated (i) by RE/MAX for cause, immediately and without notice, in the event [Carroll] defaults or otherwise fails to conduct h[er] business in accordance with the terms of this Agreement or engages in conduct which is disloyal or disrupts the office or is likely to bring discredit to the RE/MAX name, or (ii) by either party without cause, at any time, upon giving of 30 days' notice to the other.

On September 16, 2013, Carroll gave notice of her termination of the ICA. By letter dated September 25, 2013, RE/MAX terminated Carroll for cause. On

October 4, 2013, Carroll filed suit, requesting a permanent injunction[1] and declaratory relief against RE/MAX, seeking to enjoin RE/MAX from taking any portion of her real estate commissions and to have the liquidated damages provision of the ICA declared an unenforceable penalty clause.

In paragraph 7.F. of the ICA, the liquidated damages provision provides:

> **F.    COMMISSIONS    FOLLOWING    EXPIRATION/ TERMINATION.**    Following termination or non-renewal of this Agreement, [Carroll's] entitlement, of any, to receipt of further commissions shall be determined in accordance with the policy and procedures/practice of RE/MAX pertaining to such commissions. The commission split to [Carroll] for pending transaction *closing after termination* will be paid out on a 50/50 split after the 5% Broker Fee.

A bench trial was held in November 2014.  By order dated February 19, 2015, the district court found in Carroll's favor, determining the clause in dispute did "not constitute a reasonable liquidated clause but rather a penalty."  RE/MAX appealed.

## II.    Standard and Scope of Review

Though the current action was brought as one for declaratory judgment, the dispute of the parties arises out of contract.  *See Van Sloun v. Agans Bros., Inc.*, 778 N.W.2d 174, 178-79 (Iowa 2010) (finding a declaratory judgment action based on a breach of contract claim was an action at law reviewed for errors at law).    The determination of whether a liquidated damage clause is an unenforceable penalty clause is a question of law that is dependent upon the court's construction of the contract.  *See Rohlin Constr. Co. v. City of Hinton*, 476 N.W.2d 78, 79 (Iowa 1991); *see also Aurora Bus. Park Assocs., L.P. v. Michael*

---

[1] Carroll also sought a temporary injunction, which she voluntarily dismissed and the court dismissed by order dated February 14, 2014.

*Albert, Inc.*, 548 N.W.2d 153, 155 (Iowa 1996) ("Whether a contract provision is a valid liquidated damages clause or an unenforceable penalty is a question of law for the court."). "Our review is for correction of errors at law." *Id.* "We are bound by well-supported findings of facts, but are not bound by the legal conclusions of the district court." *Am. Family Mut. Ins. Co. v. Petersen*, 679 N.W.2d 571, 575 (Iowa 2004).

### III. Analysis

#### A. Applicable Law

Iowa law allows contractually proscribed liquidated damages so long as those damages do not constitute a penalty. *See Aurora*, 548 N.W.2d at 156. "[P]arties may fix damages by contract when the amount of damages is uncertain and the amount fixed is fair." *Rohlin*, 476 N.W.2d at 79.

> Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.

*Id.* at 80 (quoting Restatement (Second) of Contracts § 356(1) (Am. Law. Inst. 1981)); *see also Grunwald v. Quad City Quality Serv., Inc.*, No. 01-1353, 2003 WL 182957, at *3 (Iowa Ct. App. Jan. 29, 2003) (same). The Iowa Supreme Court has adopted the following test for a penalty as set forth in the Restatement (Second) of Contracts:

> Under the test stated in Subsection (1), two factors combine in determining whether an amount of money fixed as damages is so unreasonably large as to be a penalty. The first factor is the anticipated or actual loss caused by the breach. The amount fixed is reasonable to the extent that it approximates the actual loss that has resulted from the particular breach, even though it may not

approximate the loss that might have been anticipated under other possible breaches. Furthermore, the amount fixed is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss. The second factor is the difficulty of proof of loss. The greater the difficulty either of proving that loss has occurred or of establishing its amount with the requisite certainty, the easier it is to show that the amount fixed is reasonable. To the extent that there is uncertainty as to the harm, the estimate of the court or jury may not accord with the principle of compensation any more than does the advance estimate of the parties. A determination whether the amount fixed is a penalty turns on a combination of these two factors. If the difficulty of proof of loss is great, considerable latitude is allowed in the approximation of anticipated or actual harm. If, on the other hand, the difficulty of proof of loss is slight, less latitude is allowed in that approximation. If, to take an extreme case, it is clear that no loss at all has occurred, a provision fixing a substantial sum as damages is unenforceable.

*Rohlin*, 476 N.W.2d at 80 (quoting Restatement (Second) of Contracts § 356 cmt. b); *see also City of Davenport v. Shewry Corp.*, 674 N.W.2d 79, 85 (Iowa 2004) ("We adopted the Restatement test for a penalty, which focuses on two factors: (1) 'the anticipated or actual loss caused by the breach'; and (2) 'the difficulty of proof of loss.'" (citation omitted)). Though "liquidated damage clauses are favored," *Shewry Corp.*, 674 N.W.2d at 85, they "must compensate for loss rather than punish for breach," *Rohlin*, 476 N.W.2d at 81 (citation omitted).

"A party seeking to recover for breach of contract is entitled only to be placed in as good a position as the party would have occupied had the contract been performed." *Grunwald*, 2003 WL 182957, at *2 (citing *Midland Mut. Life Ins. Co. v. Mercy Clinics*, 579 N.W.2d 823, 831 (Iowa 1998)). Even, as here, where the contract calls for liquidated damages, "[a] party is not entitled to use the breach to better its position by recovering damages not actually suffered." *Id.*

### B.    Burden of Proof

RE/MAX first argues the district court erred by improperly placing the burden on RE/MAX to demonstrate the liquidated damages clause was not a penalty.  *See Gordon v. Pfab*, 246 N.W.2d 283, 288 (Iowa 1976) ("A party who contends that a liquidation clause is in reality a penalty has the burden to plead that fact and prove the actual damages in the trial court.").

In its ruling, the district court stated, "The court will review the totality of the evidence to determine if Carroll met her burden of establishing that [the provision in dispute] constitutes a penalty."  It further acknowledged, "Carroll is required to prove that the liquidated sum is unreasonable in light of anticipated or actual losses."  The district court then went on to analyze all the evidence presented—having noted first that "Carroll called all the witnesses that testified at trial in her case-in-chief."  The evidence considered included the testimony of Liberty, VanDerKamp, and Carroll.  The district court based its holding on numerous factors, including (i) the lack of explanation for why a 50/50 split was chosen; (ii) Liberty's claim the rate was imposed to keep the company from getting "slaughtered" when an agent left and to recoup the tremendous investment made in getting an agent started; (iii) the operating expenses Carroll paid for her RE/MAX office and the numerous payments and fees Carroll incurred pursuant to RE/MAX policies; (iv) the failure of the parties to discuss the purpose of the 50% rate at the time the ICA was executed; (v) that Carroll was aware of the provision and did not view the provision as a penalty at the time she signed the ICA; (vi) that RE/MAX would not have allowed renegotiation of the provision as it was included in all of its form contract; (vii) that no party attempted

to demonstrate the actual cost of the work RE/MAX performed as a result of the termination of the ICA; (viii) that RE/MAX never applied the 50% rate to other agents that left and had pending sales; and (ix) that the record was insufficient to establish the reasonableness of the 50% commission rate as there was insufficient evidence of the anticipated or actual losses.

Each witness was called by Carroll, and no RE/MAX employee was able to explain why the 50% rate was applied—as opposed to any other rate of increase—or the value of RE/MAX's actual or anticipated losses. It is clear from the record the district court considered all the evidence, as did the *Rohlin* court, and did not impose an impermissible burden on RE/MAX. *See Rohlin*, 476 N.W.2d at 80-81 (noting "[a] review of the record reveals uncertainty of how the sum of $400 per day for liquidated damages was derived," the person who set the amount was not called as a witness, no witness was called to justify the amount, and no studies were presented to justify the amount, concluding "[t]here is no valid justification for the individual liquidated damage amounts contained in each of the three contracts" at issue).

### C.    Reasonableness of Damages

RE/MAX next argues the district court erred in comparing the liquidated damages to actual provable losses rather than to the anticipated loss at the time of the contract. *See Aurora,* 548 N.W.2d at 157 ("The amount fixed in a liquidated damage provision 'is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss.'" (citation omitted)).

When finding in favor of Carroll, the district court noted the governing standard: "To determine if the amount fixed is fair the court requires the amount to be reasonable in light of the anticipated or *actual loss caused* by the breach." (Emphasis added.) Quoting *Engel v. Vernon*, 215 N.W.2d 506, 516 (Iowa 1974), the district court further noted the provision will be treated as a penalty where the "sum stipulated is out of reasonable proportion to the loss or injury *actually sustained* or reasonably to be anticipated." (Emphasis added.)

In its analysis, the district court considered both the anticipated and actual losses, noting "the record contains insufficient evidence to establish what the anticipated or actual losses would be" and thus "[t]he evidence did not establish that [the liquidated damages] bore a reasonable relationship to the anticipated losses or actual losses." The court repeatedly noted the lack of evidence demonstrating why the 50/50 split was imposed, *see Rohlin*, 476 N.W.2d at 81 (noting the lack of "valid justification for the individual liquidated damage amounts"), or what amount of damages was actually incurred by RE/MAX that would justify the marked increase in the commissions paid to RE/MAX, *see Grunwald*, 2003 WL 182957, at *3 ("In this case, the amount of liquidated damages provided by the contract was not reasonable in light of the actual loss sustained by the breach."). We find no error.

### D. Whether the Liquidated Damages Clause was a Penalty

Finally, RE/MAX contends the district court erred in determining the liquidation damages clause was a penalty clause.

"We first address whether the amount of actual damages resulting from a breach of the lease were uncertain." *Aurora*, 548 N.W.2d at 156. "The greater

the difficulty either of proving that loss has occurred or of establishing its amount with requisite certainty, the easier it is to show the amount fixed is reasonable." *Shewry Corp.*, 674 N.W.2d at 85 (citation omitted). The district court noted that, after Carroll left, RE/MAX spent three or four weeks obtaining information on Carroll's listings that were not in the listings' respective files, including contact information for the sellers and missing forms required to service the accounts. RE/MAX also had to contact the sellers about their homes in order to assign each seller an appropriate agent. The district court determined, however, "the record did not demonstrate that damages for a breach of the ICA were so uncertain that a liquidated damage clause was needed."

RE/MAX argues damages are particularly hard to calculate in this instance because there is no hourly rate for real estate agents; thus, there is no objective measure for the time expended on these tasks. However, the record indicates that the office staff, Liberty, and VanDerkamp dealt with Carroll's listings for the first four to six weeks, not the other contract realtors.

Liberty testified that Carroll had over one hundred listings at the time of her departure.[2] He further stated that, had Carroll remained with the company, she would have handled the open houses, viewings, and offers on those properties, as well as all communications with the potential buyers and sellers and their agents. But the record establishes that the listings—those properties

---

[2] Carroll testified that of these approximate one hundred listings, only ten of them stayed with RE/MAX. The rest either elected to stay with Carroll while others found a new broker. Of the ten, two closed with RE/MAX and resulted in commissions. In addition, there were approximately twenty-one pending sales at the time Carroll left—that is, properties for which there had been an offer and acceptance—resulting in approximately $100,000 in pending commissions.

where no offer and acceptance had occurred as of the time of termination—were reassigned to other realtors. Liberty testified that once one of Carroll's listing was transferred to a new agent, *that* agent received any resulting commissions instead of Carroll. This testimony was reinforced by Carroll, who testified her understanding was that the remaining listings were reassigned to new realtors. Carroll testified that work resulted from her departure but that this was simply a shifting of work to other realtors that were then eligible to receive a commission for that work. Carroll indicated her departure would not have caused RE/MAX a significant amount of additional work, as most of the tasks incurred were already part of the broker's responsibility. Thus, the new agents were compensated for their time, in the same manner they would have been for any other listing, and RE/MAX received its usual commission in accordance with the contractual agreements it had in place with those agents.

Even assuming the amount of loss were difficult to prove with any degree of certainty, we must also consider "whether the amount of liquidated damages under the [applicable] clause is reasonable." *Aurora*, 548 N.W.2d at 156; *Shewry Corp.*, 674 N.W.2d at 85-86 (considering "the question whether the damages set in the contract . . . is an unreasonably large sum in view of the anticipated or actual harm"). The district court concluded, in relevant part, (1) "[t]he record is insufficient to establish that the 50% commission rate is a reasonable rate since the record contains insufficient evidence to establish what the anticipated or actual losses would be," and (2) "no evidence was presented to demonstrate the value of that work or whether [RE/MAX] suffered damage as a result since they receive at least the 5% commission rate they were allowed under the ICA no

matter who closed the sale." Again, the district court based its findings on the testimony Carroll presented through RE/MAX employees who were unable to explain how the 50/50 rate was reached or what the actual damages or anticipated damages were.

At trial, Liberty argued the purpose of the damages clause was "to keep the company from just being slaughtered financially from agents leaving and leaving us behind with all the costs that we've incurred [from] helping them build their businesses." But the damages provision and 50/50 split is in every realtor contract. The damages do not decrease over time to adjust for the profit made from these agents—which presumably recoups investment expenses. Per the terms of the standard contract, this same penalty would be imposed upon an agent that had been with the company for a few months the same as it would for one who had been with the company for decades. In addition, despite the purported purpose of the provision being recoupment of investment, the record establishes this is the first time RE/MAX elected to exercise this provision in the eighteen months before Carroll left, despite fifteen other agents leaving; agents for whom RE/MAX presumably incurred investments expenses.

Further, a considerable portion of these investment costs were already paid for by Carroll and the other realtors. Carroll paid, amongst other costs and fees, a portion of each closing to RE/MAX, transaction fees, seller and buyer fees, and an office free of $1500 a month for overhead costs.[3] Carroll also paid for her own administrative assistant, her own signage, her own personal

---

[3] Carroll admitted that there were certain operating expenses generally incurred by RE/MAX for the company and its realtors, including advertising for RE/MAX, office space for its realtors, utilities, and office furniture and equipment.

advertising, some of the general office advertising, and, for part of her time with RE/MAX, for the cleaning services and receptionist. Finally, Liberty testified the 50/50 split is an industry standard that helped to cover the expense of other personnel hired for the operation of the company. Yet there is no indication that these expenses were incurred by virtue of Carroll's breach of the ICA. *See Rohlin*, 476 N.W.2d at 80 (providing it is "[d]amages for breach" that "may be liquidated in the agreement" (citation omitted)).

RE/MAX also argues the damages clause helps them recoup the expenses incurred based upon Carroll's poor record keeping, including her failure to maintain files in the office and her failure to keep complete information on each file. But the evidence also shows RE/MAX already had the responsibility to ensure these records were retained, regardless of whether Carroll had stayed or left. Liberty testified RE/MAX had a "responsibility as a broker . . . to have things in order" and "review[ed] files as they c[a]me in. . . . If there was something missing, you know, we probably should have caught it." Liberty further testified that, when a file gets to closing, they "have to make sure everything is right and documented" and that the broker's responsibility does not change regardless of whether the realtor has remained with or left RE/MAX. Liberty stated there is a checklist or procedure the office goes by pursuant to which other employees review the listings and send notifications when information is missing. Liberty also admitted that, when asked, Carroll was forthcoming with the missing information. There is simply no indication that the

time spent to fix poor record keeping was an anticipated damage or a damage resulting from Carroll's departure.[4]

Specific to those listings Carroll had where a signed offer and acceptance had been secured, Liberty indicated RE/MAX still had to re-walk-through those properties, follow-up with attorneys and the closing department, and complete paperwork. But Liberty also indicated "the agents do not realize that because it's going on all behind the scenes." There was no indication that these tasks were different than what already would have been required of RE/MAX had Carroll not left.

RE/MAX also points to the time expended by other real estate agents, but, as noted above, in the event the case was reassigned to a new agent, the terms of that agent's contract governed. There simply is no evidence to support that this marked increase reflects any actual or anticipated losses.

As noted by the district court, the amount of liquidated damages set here equals "tens of thousands of dollars." It is an unexplained increase from RE/MAX's entitlement to 5% of the commission to 52.5% of the commissions, which is "unreasonably large and goes far beyond the anticipated loss" resulting from Carroll's departure. *See Rohlin*, 476 N.W.2d at 81. There is no indication what amount of losses RE/MAX actually sustained and no explanation why the 50/50 split reasonably portrayed the anticipated or actual losses. Upon our

---

[4] Another former realtor for RE/MAX, who worked for three years in the same location where Carroll had been employed, also testified that she never included phone numbers or e-mail addresses on the listing contracts, which was some of the information Liberty indicated was missing from Carroll's files. She further testified that her listings were reviewed as a matter of course by other persons in the office, and that she was notified when necessary information was missing. She stated that when she left RE/MAX the 50/50 split was not applied to the commission she received from her remaining listing.

review, we find the district court did not err in finding the liquidation clause was an unenforceable penalty clause.

**IV.    Conclusion**

For the foregoing reasons, the judgment of the district court is affirmed.

**AFFIRMED.**