CITY OF DAVENPORT, Appellee,

v.

The SHEWRY CORPORATION d/b/a Tri–City Fabricating and Welding Co., Inc., and Donald Shewry, Appellants.

No. 02–0460.

Supreme Court of Iowa.

Jan. 22, 2004.

Steven J. Havercamp of Stanley, Lande & Hunter, Davenport, for appellants.

Christopher S. Jackson, Davenport, for appellee.

TERNUS, Justice.

The district court entered a judgment against the appellants, The Shewry Corporation and its principal owner, Donald Shewry, for the return of economic development grant monies the company received from the appellee, City of Davenport, based on the company's failure to meet its obligations under an economic development agreement with the City. Shewry and the company appeal, claiming the district court erred in three particulars: (1) in dismissing their claim for an accounting by the City; (2) in failing to hold the repayment provision in the parties' agreement was unconscionable and a prohibited penalty clause; and (3) in entering judgment against the company for the amount of the grants, $150,000, and against Shewry for the amount of his guaranty, $75,000. Finding no error, we affirm.

## I. *Background Facts and Proceedings.*

In 1996 The Shewry Corporation, d/b/a Tri–City Fabricating and Welding Co., Inc., entered into an economic development agreement (EDA) with the City of Davenport. This agreement contemplated that the company would build a new welding and fabrication facility on property acquired by the company in a tax increment financing (TIF) district located in the City of Davenport. The City agreed to provide up to $200,000 of economic development grant money to the company in three phases coinciding with the company's construction of taxable improvements to its property. The issuance of each phase of grant money was dependent upon the company making the specified improvements. In addition, the company was required to create 60 new full-time positions within thirty-six months of the date of the agreement, retain 186 existing jobs, and maintain at least 246 full-time equivalent positions from the thirty-sixth month through the one-hundred-twentieth month of the agreement.

The EDA provided that a material breach of the agreement by the company would require repayment of all grant monies already received. Moreover, the agreement specified that the company's failure to meet the employment requirements would be considered a material breach.

The parties also executed assessment agreements for each phase of the project, which were incorporated in the EDA. *See generally* Iowa Code § 403.6(19) (1997) (authorizing municipalities to enter into assessment agreements upon entering into a development agreement). The assessment agreements expressed the parties' intent that the "property taxes generated by the net gain in taxable values to be created by the [company] through its timely construction and equipping of its new facilities [would] be more than sufficient to completely repay the [bonds] issued by the City." To ensure this result, the company and the City agreed to a specific "minimum actual value" upon which the property would be assessed until the bonds were retired.

The liability of the company under the EDA was secured by two guaranties. Shewry, the president and owner of the company, signed a personal guaranty in the amount of $75,000 to secure the company's obligation under the agreement. In addition, Shewry signed a guaranty as president of the company that also secured the contractual obligation. The company's guaranty was similarly limited to $75,000.

Pursuant to the EDA, the City advanced $50,000 to the company on August 30, 1996, and an additional $100,000 on March 18, 1997. The company used these funds to finance improvements to its property, resulting in increased valuations and

increased property tax assessments, as contemplated by the agreement. Unfortunately, the company did not meet the employment requirements of the contract. The company eventually sold the facility without reaching phase III of the economic development project.

On March 9, 2001, the City filed this action against the company and Shewry, seeking to recoup the $150,000 in grant money previously dispersed. It sought the entire sum from the company based on the company's repayment obligation under the EDA, and $75,000 from Shewry based on his personal guaranty.

The defendants claimed the repayment requirement of the EDA was an unconscionable penalty, but Judge Kelley held it was not in his ruling on the City's motion for summary judgment. The company and Shewry also sought an accounting, claiming that any increased tax revenues generated by the improvements made to the company's property should serve as an offset against its liability for repayment under the EDA.

The defendants' counterclaim was tried to the court, Judge Darbyshire, along with the City's claim. The district court denied the defendants' request for an accounting, and entered judgment against the company for $150,000 and against Shewry for $75,000. In a subsequent ruling on the defendants' Iowa Rule of Civil Procedure 1.904(2) motion, the court clarified that the judgment against Shewry was "only upon his guaranty" and that he would have no liability if the company satisfied the $150,000 judgment. The defendants appealed.

II. *Issues on Appeal and Scope of Review.*

■ ▪The defendants first challenge the district court's adverse ruling on their counterclaim, which they have characterized as a claim for an "accounting." Based on this characterization, they assert de novo review is required. *See Atlantic Veneer Corp. v. Sears*, 232 N.W.2d 499, 502 (Iowa 1975) (stating "accounting issues are usually deemed to stand in equity"). We are not entirely convinced the counterclaim asserts an equitable claim to an accounting, as opposed to simply seeking a contractual offset against the company's liability. Nor are we certain the district court tried the matter in equity. Notwithstanding these reservations, we will review the trial court's disposition of this claim de novo for two reasons: (1) our ultimate resolution of this issue is the same under a de novo review as it would be under a review for correction of errors of law; and (2) the parties appear to be in agreement that the counterclaim was equitable and was tried in equity. *See Johnson v. Kaster*, 637 N.W.2d 174, 177 (Iowa 2001) (stating court "will hear a case on appeal in the same manner in which it was tried in the district court").

■ The second issue on appeal is a challenge to the district court's summary judgment ruling that the repayment provision was not an unconscionable penalty clause as a matter of law. We review this ruling for correction of errors of law. *See Kelly v. Iowa Mut. Ins. Co.*, 620 N.W.2d 637, 641 (Iowa 2000). In doing so, we must " 'determine whether a genuine issue of material fact exists and whether the law was correctly applied.' " *Id.* (citation omitted).

■ The defendants' final issue on appeal is that the maximum liability of the company and Shewry was $75,000 and the court erred in entering judgment against the company for $150,000. We review this alleged error for correction of errors of law. *See In re Mount Pleasant Bank & Trust Co.*, 426 N.W.2d 126, 129 (Iowa

1988). The factual findings made by the district court are binding on appeal if supported by substantial evidence. *See id.* We are not bound, of course, by the trial court's conclusions of law or its application of legal principles. *See id.*

### III. *Dismissal of Defendants' Counterclaim For an Accounting.*

■ In their counterclaim, the defendants allege the company paid approximately $134,000 in real estate taxes from 1997 through 2002 specifically allocated to the TIF district on its property tax statements. *See generally* Iowa Code § 403.19 (allowing portion of property taxes to be allocated to tax increment financing). The defendants assert the City wrongly refused to account for these payments and credit this sum against the company's liability under the EDA. The district court concluded the EDA did not provide for such an offset, and therefore there was no legal basis upon which to require an accounting. Upon our de novo review, we think the trial court was correct.

The EDA clearly evidences the City's intent to issue general obligation bonds to fund the economic development grants to the company. The contract documents also recite the City's plan to retire these bonds using the increased tax revenues generated by the improvements to the company's property and the assessment agreements. What is not present in the parties' agreement, however, is any express statement or implication that property taxes paid by the company and allocated to the TIF district would be credited against the company's liability under the EDA. The parties' clear intent that the tax revenues would be used to amortize the bonds does not reveal an intent that the tax revenues would be used to repay the grants. Retirement of the bonds and re-

payment of the grants are different obligations imposed on different parties.

We also reject the defendants' argument that our decision in *Norwest Credit, Inc. v. City of Davenport,* 626 N.W.2d 153 (Iowa 2001), requires the requested offset. In that case the property owner, Brammer Company, LLC, had entered into an assessment agreement with the City of Davenport in exchange for a $500,000 economic development grant. *Norwest Credit,* 626 N.W.2d at 154. The issue in the case was whether this agreement was binding on the purchaser of the property upon the foreclosure of a mortgage recorded prior to the assessment agreement. *Id.* at 154–55.

The defendants rely on the following general comments in that case:

An assessment agreement is a way to finance improvements to local real estate, usually in blighted areas. *See* Black's Law Dictionary 111–12 (7th ed. 1999).

These assessments are, in a certain sense, taxes. But an assessment differs from a general tax in that an assessment is levied only on property in the immediate vicinity of some local municipal improvement and is valid only where the property assessed receives some special benefit differing from the benefit that the general public enjoys.

Robert Kratovil, *Real Estate Law* 465 (6th ed. 1974). The agreement is usually financed by the real estate holder assuming a bonded indebtedness. In the instant case, the amount of the bond covering the loan to Brammer was $500,000. The assessment on the real estate in question was then fixed at $2.5 million. The goal of this agreement was to amortize repayment of the $500,000

*grant* through the increased taxes Brammer would pay given the property's new taxable value.

*Id.* (emphasis added). The defendants seize on this language to support their argument that an assessment agreement is designed to generate revenue for repayment of the *grant made to the property owner* through the property owner's increased tax payments. Based on this purpose, the defendants claim they are entitled to a credit in the amount of the increased taxes the company paid against the company's obligation to return the grant monies.

1. It appears the court's mistake may have arisen in part from our failure to distinguish the use of "assessment" in the sense of a "special assessment" or charge against specific property and the use of "assessment" in the sense of determining the value of property to be taxed. The comments quoted from Kratovil's book on real estate law describe the former, "special, or local assessments." *See* Robert Kratovil, *Real Estate Law* 465 (6th ed. 1974) (stating in the sentence immediately preceding the material quoted in *Norwest Credit:* "[Local] improvements [which benefit particular real estate or limited areas of land] are usually financed by means of special, or local, assessments."). Special assessments are a tool given to cities to assist them in financing public improvements. *See* Iowa Code §§ 384.37–.79 (setting forth requirements and procedure for city's assessment of costs of public improvements on private property). A special or local assessment requires the owner of property that will benefit from a public improvement made in the vicinity of the property to pay a portion of the cost of that improvement. *See Home Builders Ass'n v. City of West Des Moines*, 644 N.W.2d 339, 346 n. 2 (Iowa 2002) (stating "cities may impose a special tax assessment on property for 'the cost of construction and repair of public improvements,'" quoting Iowa Code § 384.38(1)); *Newman v. City of Indianola*, 232 N.W.2d 568, 573–74 (Iowa 1975) (" 'special assessments are generally imposed by an exercise of the taxing power' " (citation omitted)). That is not the type of assessment at issue in *Norwest Credit* and is not the type of assessment at issue here. The "assessment"

■ Upon reviewing our discussion in *Norwest Credit*, we conclude this court simply misspoke when it said the goal of an assessment agreement is to amortize the *grant*.[1] The goal of an assessment agreement is to generate tax revenues to allow the municipality to amortize the *bond*, not the grant. This goal was clearly expressed in the contract documents at issue here. Thus, our unfortunate misstatement in *Norwest Credit* does not alter our conclusion here that the company is not entitled to offset its liability under the EDA for repayment of the grant monies by the TIF portion of its property tax payments.[2]

involved in this case and the *Norwest Credit* case is a determination of the amount of tax to be imposed on real property based on the actual value of the property. *See* Iowa Code §§ 403.6(19) (stating assessment agreement executed in connection with economic development grant must be reviewed by the assessor "legally responsible for the assessment of the ... property"), 441.19 ("The assessor shall ... assess all the property in the county or city, except property exempted or otherwise assessed."), 441.21 (stating actual value of property shall be considered its "assessed value"). We disavow any intent in *Norwest Credit* to equate a special assessment under chapter 384 with the assessment that is the subject of an assessment agreement under chapter 403. The comments quoted from the Kravotil book in *Norwest Credit* are simply irrelevant to the interpretation of an assessment agreement executed as part of an economic development project.

2. The defendants also complain of the trial court's ruling that the testimony of their witness, Rick Day, was irrelevant. Day's testimony was offered to prove that the company had made sufficient improvements to generate more than adequate tax revenues to retire the bonds issued by the City, and that as much as $134,384 of property tax payments made by the company should have been applied to the bonds. Because we agree with the district court that the company is not entitled to an offset for the increased property taxes it paid, we find no abuse of discretion in the trial court's refusal to hear Day's testimony. *See Mercer v. Pittway Corp.*, 616 N.W.2d

IV. *Enforceability of Repayment Provision.*

The defendants claim the contract requirement that the company fully repay the economic development grants if it failed to meet any of its obligations under the EDA was an unenforceable penalty. It argues the amount of the repayment is disproportionate to any damage reasonably anticipated from breach of the contract.

The City argues the repayment requirement is more accurately characterized as a liquidated damage clause. It argues any damages resulting from the company's failure to perform its contractual obligations would be difficult to ascertain, thereby supporting such a provision.

■ We first note that the determination of whether a liquidated damage clause is actually a penalty clause "is a question of law for the court which is dependent upon the court's construction of the contract." *Rohlin Constr. Co. v. City of Hinton*, 476 N.W.2d 78, 79 (Iowa 1991). In *Rohlin*, we observed that liquidated damage clauses are favored, but a contract "'term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.'" *Id.* at 80 (quoting Restatement (Second) of Contracts § 356(1) (1981) [hereinafter Restatement] ). We adopted the Restatement test for a penalty, which focuses on two factors: (1) "'the anticipated or actual loss caused by the breach'"; and (2) "'the difficulty of proof of loss.'" *Id.* (quoting Restatement § 356(1) cmt. b); *accord Aurora Bus. Park Assocs., L.P. v. Michael Albert, Inc.*, 548 N.W.2d 153, 156–57 (Iowa 1996). "'The greater the difficulty either of proving that loss has occurred or of establishing its amount with the requisite certainty, the easier it is to show that the amount fixed is reasonable.'" *Rohlin*, 476 N.W.2d at 80 (quoting Restatement § 356(1) cmt. b).

■ The defendants' claim that the repayment provision is a penalty rests on their erroneous assumption that the City's only loss is the grant money paid to the company. The defendants argue these damages are readily ascertainable. In addition they contend the company has already paid $134,000 in additional property taxes to the City's benefit and to require it to pay an additional $150,000 results in payments to the City that are disproportionate to any damage resulting from the company's breach of the EDA.

We disagree with the defendants' assumption that the only damage sustained by the City as a result of the company's failure to perform its obligations under the agreement was the loss of the grant money. This assumption ignores the fact that the EDA expressly recognized *two* anticipated benefits to the City from the company's performance of its contractual obligations: (1) an increased tax base; and (2) the creation of jobs. Although damages from a failure to realize the first benefit may be easily computed, the City's loss from the company's failure to create the jobs required by the EDA is difficult, if not impossible, to measure. New workers earn payroll dollars that are spent in the community, generating income for other residents who then spend their earnings, and so on. We conclude the City would have great difficulty in establishing with any degree of certainty the loss it has sustained from the company's breach of the EDA.

■ That leaves, then, the question whether the damages set in the contract—the amount of the grant money—is an

602, 612 (Iowa 2000) ("We review a district court's decision concerning the admission of relevant evidence for an abuse of discretion.").

unreasonably large sum in view of the anticipated or actual harm. Clearly it is not. While the City will recover the cash outlays made to the company, this repayment does not cover the costs to the City in issuing the bonds required to obtain the grant funds, nor does it encompass the damages resulting from loss of the anticipated jobs.

We find no merit in the defendants' argument that the $134,000 paid by the company in property taxes must also be factored into the analysis. The company's payment of property taxes is not equivalent to payment of damages to the City. The company would owe property taxes even in the absence of the EDA. Furthermore, the company did not pay inflated taxes, notwithstanding the minimum actual value set in the assessment agreements, because, as the company concedes, the extent of its improvements clearly supported the increased valuation of its property.[3]

In summary, the contractual provision requiring the company to repay the $150,000 it received from the City is a valid liquidated damage clause. The actual loss sustained by the City from the company's breach of the agreement is difficult to ascertain, and the amount the company must pay upon its breach is not unreasonably large given the identifiable losses sustained by the City from the company's failure to meet its contractual obligations. We conclude the district court did not err in ruling the repayment requirement was not an unenforceable penalty.

### V. *Amount of Judgment.*

The EDA executed by the company required it to repay any grant monies, "not to exceed $200,000 in total," if it failed to fulfill its obligations under the agreement. The EDA also provided that this obligation would be "secured by a personal and corporate guaranty in that amount by the principal of the business."

For reasons not shown in the record, two guaranties were executed by Shewry, one in his individual capacity and one in his capacity as president of the company. Both guaranties were limited to $75,000. The record is unenlightening as to why the EDA contemplated a corporate guaranty. "[A] guaranty is a contract by one person to another for the fulfillment of a promise of a *third person.*" *Andrews & Co. v. Tedford,* 37 Iowa 314, 316 (1873) (emphasis added). Here the company guaranteed its own performance under the EDA.

The defendants contend the guaranty given by the company limited its liability under the EDA to $75,000. They also argue that the guaranty given by Shewry individually simply guaranteed the company's guaranty, so that the maximum recovery by the City from both defendants is limited to $75,000. The district court concluded the company's obligation under the EDA was $150,000 and that Shewry had guaranteed that obligation to the extent of $75,000.[4] We think the court was right.

---

**3.** Under the terms of the assessment agreement for phase II, the parties agreed that effective January 1, 1998, the minimum actual value that would be assessed for the company's land and building would be $1,163,046. In fact, the assessed valuation as of that date was $1,942,800.

**4.** The defendants repeatedly refer in their briefs to the earlier summary judgment ruling in which Judge Kelley, interpreting the guaranties, held that the City could only recover $75,000 from the company and an additional $75,000 from Shewry, individually. It is not clear whether the defendants cite this ruling as support for their position or whether they think it governed the later trial before Judge

The City sought to recover from the company pursuant to the terms of the EDA, not under its guaranty. The EDA clearly requires the company to repay the total amount of the grants it received—$150,000. While it is unclear why the company would guarantee its own performance, the corporate guaranty is not at issue here. *Cf. Andrews & Co.*, 37 Iowa at 316 (holding guarantor's liability was determined by reference to the obligations assumed by the guarantor in the guaranty, not by reference to the contract of the primary obligor). Although the company argues that its guaranty somehow limited its liability under the EDA, we find no provision in the guaranty to support this contention. The guaranty simply says that the company's liability *under the guaranty* is limited to $75,000. It does not purport to modify the EDA. To hold that a "guaranty" modifies the undertaking of the principal obligor is contrary to the nature of a guaranty, which is to secure the primary undertaking, not reduce it. We think the trial court properly refused to interpret the guaranty as a modification of the EDA in the absence of a clear expression of such intent by the parties.

Finally, we reject the defendants' argument that Shewry's guaranty secures the company's performance of its guaranty, rather than the company's performance of its obligations under the EDA. Shewry

specifically guaranteed payments due "under the Economic Development Agreement." The defendants' contrary contention lacks any merit.

VI. *Summary and Disposition.*

The trial court did not err in refusing to require the City to account to the defendants for incremental tax payments made by the company and allocated to the TIF district. The economic development agreement and incorporated assessment agreements did not provide that such payments would serve as an offset against the company's liability upon breach of the contract.

The district court also correctly rejected the defendants' argument that the repayment provision was an unconscionable penalty. Based on the uncertainty of the City's damages upon the company's failure to perform and the reasonable amount of the repayment required, the challenged provision was a valid and enforceable liquidated damage clause.

Finally, the trial court properly entered judgment in the amount of $150,000 against the company under the EDA, and against Shewry in the sum of $75,000 based on his personal guaranty. As specified by the district court, Shewry's liability will be extinguished should the company

---

Darbyshire. If the latter thought prompted their reliance on Judge Kelley's ruling, we simply point out that Judge Kelley's summary judgment discussion of this issue did not prevent Judge Darbyshire from issuing a contrary ruling after trial. *See, e.g., Ahls v. Sherwood/Division of Harsco Corp.*, 473 N.W.2d 619, 624 (Iowa 1991) ("An interlocutory order is not the law of the case because the court is free to change it at a later time." (citing cases)); *Kendall/Hunt Publ'g Co. v. Rowe*, 424 N.W.2d 235, 240 (Iowa 1988) ("A

trial judge may usually correct his or her own rulings or that of another judge of the same court anytime before final judgment."). The decision reviewed on appeal is the final ruling on this issue in the district court—Judge Darbyshire's order. *See Am. Family Mut. Ins. Co. v. Allied Mut. Ins. Co.*, 562 N.W.2d 159, 163 n. 3 (Iowa 1997) (noting review of district court's final ruling was "not controlled by an earlier order entered by another judge," which was not final and therefore did not establish the law of the case).

pay the $150,000 judgment entered against it.

**AFFIRMED.**

All justices concur except WIGGINS, J., who takes no part.