# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

DD Dannar, LLC, Appellant,

v.

SC LAUNCH!, Inc., Respondent.

Appellate Case No. 2017-002029

———————

Appeal From Greenville County
Robin B. Stilwell, Circuit Court Judge
Perry H. Gravely, Circuit Court Judge[1]

———————

Opinion No. 5743
Submitted May 8, 2020 – Filed July 8, 2020

———————

## AFFIRMED

———————

Emily Irene Bridges and Natalma M. McKnew, of Fox Rothschild LLP, of Greenville, for Appellant.

Robert Yates Knowlton, Sr. and Elizabeth Halligan Black, of Haynsworth Sinkler Boyd, PA, of Columbia, for Respondent.

———————

**GEATHERS, J.:** In this declaratory judgment action, Appellant DD Dannar, LLC (Dannar), seeks review of the circuit court's order granting summary judgment to

---

[1] After the Honorable Robin B. Stillwell issued an order granting summary judgment to Respondent, the Honorable Perry H. Gravely conducted a hearing on Respondent's motion for attorney's fees and subsequently issued an order granting the motion.

Respondent SC LAUNCH!, Inc. (SCL). Dannar argues the circuit court erred by concluding that the parties' financing agreement was not extinguished upon Dannar's full repayment of SCL's business loan to Dannar. Dannar also argues the circuit court erred by concluding that the relocation fee referenced in the financing agreement was not an unenforceable penalty. We affirm.

## FACTS/PROCEDURAL HISTORY

In 2006, the South Carolina Research Authority (SCRA) formed the SC Launch program to advance applied research, product development, and commercialization programs and to strengthen the state's knowledge economy to create high-paying jobs.[2] The program partners with SCRA and the research foundations of the University of South Carolina, the Medical University of South Carolina, and Clemson University to support high-potential companies with grant funding and services.

The program is administered through SCL, a South Carolina non-profit 501(c)(3) corporation, and makes seed investments in anticipation of financial returns. Specifically, according to SCL's executive director, Harry Hillman, the program

---

[2] In 1983, the General Assembly created SCRA "to enhance the research capabilities of the state's public and private universities, to establish a continuing forum to foster greater dialogue throughout the research community within the State, and to promote the development of high technology industries and research facilities in South Carolina." S.C. Code Ann. § 13-17-10, -20 (2017). SCRA created the SC Launch program in accordance with the requirements of sections 13-17-87 and -88 of the South Carolina Code (2017). Section 13-17-87 requires a division of SCRA (the South Carolina Research Innovation Centers (SCRIC)) to establish three Research Innovation Centers to operate in conjunction with the state's research universities for the purposes of, *inter alia*, promoting the development of high technology industries in the state and maximizing the use of innovation center funds for partnerships between the public and private sectors to generate professional research and development jobs in the state. § 13-17-87(A)–(B). Section 13-17-88 establishes within each of the SCRIC's "a target program of excellence reflecting the basic research currently undertaken at each center and serving as the focal point of the state's applied research and development in each of the program areas of excellence." § 13-17-88(A). Section 13-17-88 also establishes an Industry Partnership Fund at the SCRA or an SCRA-designated affiliate for the acceptance of contributions for funding the programs.

> supports advanced technology and knowledge-based businesses with seed capital that fills gaps in funding from individual investors, angel investment groups, lenders, private equity firms, and other sources. Funding from SC Launch is supplemental; it is not intended to replace funding from other sources. Returns from SC Launch investments help fund continuing SC Launch programs and investments.

An average of twelve companies per year are selected for an initial round of funding, and additional "follow-on funding" may be awarded under certain circumstances. SCL staff members dedicate significant time and energy into developing and mentoring the companies admitted into the program. SCL refers to these companies as "Client Companies."

On April 14, 2011, SCL loaned $200,000 to Dannar, which "designs and manufactures an alternatively powered multi-purpose maintenance vehicle called the Mobile Power Station for use in the government sector." Previously, Dannar had been unsuccessful in obtaining private investment for its business. The parties entered into a Financing Agreement setting forth the terms of the loan, and Dannar executed a promissory note (the Note), committing to pay back the $200,000, plus interest, by April 14, 2014. The Financing Agreement included a provision in which Dannar agreed that it would not relocate its business, principal office, or principal place of business outside of the state or locate more than one-half of its employees outside the state for a period of five years from the date of the agreement unless Dannar paid a $200,000 relocation fee to SCL. This five-year period did not expire until April 14, 2016.

In late 2012, Dannar began seeking additional funding from other states, including Indiana. According to Mark Housley, SCL's Upstate Regional Manager, during his involvement with Dannar, the company's principal, Gary Dannar, told Housley that Mrs. Dannar was unhappy living in Greenville and wanted to return to her home state of Indiana. In March 2013, Dannar applied to SCL for follow-on funding, but SCL denied the request.

In late April 2013, Mr. Dannar met with Hillman to discuss repaying the loan early. During the meeting, Mr. Dannar acknowledged that his company "would not be moving forward were it not for the support of and investment made by [SCL]." The next day, Dannar paid the balance due on the loan. In late June 2013, SCL

became aware of a public announcement by Dannar and the Muncie-Delaware County, Indiana Economic Development Alliance indicating that Dannar was relocating its corporate headquarters and assembly facility to Muncie, Indiana. Subsequently, on July 23, 2013, Dannar entered into a Redevelopment Agreement with Delaware County, Indiana, in which the county agreed to issue economic development bonds and loan the $150,000 proceeds to Dannar by August 1, 2013. The county also agreed to place $500,000 into an escrow account for (1) improvements to a facility to be used by Dannar and (2) the purchase of equipment and furniture.

In September and November 2013, SCL sent letters to Dannar requesting payment of the relocation fee. On November 25, 2013, Dannar's counsel "denied that Dannar had relocated under the [Financing] Agreement." In letters dated December 13, 2013, and September 19, 2014, counsel likewise assured SCL there had been no relocation. SCL responded that it would agree not to pursue the relocation fee "if Dannar would confirm by affidavit that it had in fact not relocated."

On January 7, 2015, Dannar filed this action pursuant to the Uniform Declaratory Judgments Act,[3] seeking an order declaring that (1) once Dannar paid the balance due on the loan, the Relocation Provision was "no longer in full force and effect[,] and[] therefore, [Dannar] was not . . . obligated to pay the Relocation Fee"; (2) Dannar had not violated the Relocation Provision; or (3) the relocation fee is an unenforceable penalty. In response to SCL's motion to dismiss, Dannar withdrew the complaint and obtained leave to file a supplemental complaint. On April 28, 2015, Dannar filed its supplemental complaint, stating that Dannar intended to relocate its business to Indiana and as of April 1, 2015, it had relocated a majority of its assets and inventory to Indiana. The supplemental complaint also stated that Dannar took the following actions in Indiana: (1) entered into building and property leases, (2) established utility and communications services, and (3) hired two employees. Moreover, Dannar stated that it retained one employee in South Carolina and recanted the original complaint's allegations that Dannar had not relocated.

On June 2, 2015, SCL filed an answer and counterclaim for breach of contract. The parties later filed cross-motions for summary judgment, and the circuit court granted summary judgment to SCL, awarding SCL $200,000 plus prejudgment interest. In its order, the circuit court noted that the parties agreed there were "no genuine issues as to any material fact in this case" and the court's sole task was to

---

[3] S.C. Code Ann. §§ 15-53-10 to -140 (2005 & Supp. 2019).

construe the Financing Agreement. The court concluded that Dannar's repayment of the Note did not extinguish its remaining obligations under the Financing Agreement, including its obligations under the Relocation Provision. The court also concluded that the relocation fee did not constitute an unenforceable penalty. Subsequently, the Honorable Perry H. Gravely granted SCL's motion for attorney's fees and expenses. This appeal followed.

## ISSUES ON APPEAL

1.    Did Dannar's repayment of the Note extinguish all of its obligations under the Financing Agreement?

2.    Was the Relocation Provision an unenforceable penalty?

## STANDARD OF REVIEW

This court reviews the grant of a summary judgment motion under the same standard applied by the trial court pursuant to Rule 56(c), SCRCP. *Jackson v. Bermuda Sands, Inc.*, 383 S.C. 11, 14 n.2, 677 S.E.2d 612, 614 n.2 (Ct. App. 2009). Rule 56(c), SCRCP, provides that summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Further, "[w]hen a circuit court grants summary judgment on a question of law, this [c]ourt will review the ruling de novo." *Wright v. PRG Real Estate Mgmt., Inc.*, 426 S.C. 202, 212, 826 S.E.2d 285, 290 (2019).

## LAW/ANALYSIS

### I.    Effect of Note Repayment

Dannar argues the circuit court erred by concluding that full repayment of the Note did not extinguish all of Dannar's obligations under the Financing Agreement. We disagree.

"The cardinal rule of contract interpretation is to ascertain and give effect to the intention of the parties." *Barnacle Broad., Inc. v. Baker Broad., Inc.*, 343 S.C. 140, 146, 538 S.E.2d 672, 675 (Ct. App. 2000) (quoting *Chan v. Thompson*, 302 S.C. 285, 289, 395 S.E.2d 731, 734 (Ct. App. 1990)). "In determining the intention of the parties, a court first looks to the language of the contract and if the language

is clear and unambiguous, the language alone determines the contract's force and effect." *Id.* at 146–47, 538 S.E.2d at 675. The terms the parties have used must "be taken and understood in their plain, ordinary and popular sense." *C.A.N. Enters., Inc. v. S.C. Health & Human Servs. Fin. Comm'n*, 296 S.C. 373, 377, 373 S.E.2d 584, 586 (1988). Further, "[t]he parties' intention must be gathered from the contents of the entire agreement and not from any particular clause thereof." *Abel v. S.C. Dep't of Health & Envtl. Control*, 419 S.C. 434, 441, 798 S.E.2d 445, 448 (Ct. App. 2017) (quoting *Ecclesiastes Prod. Ministries v. Outparcel Assocs., LLC*, 374 S.C. 483, 498, 649 S.E.2d 494, 502 (Ct. App. 2007)).

The Relocation Provision in section 3.3 of the Financing Agreement, provides,

> A. <u>Company Relocation</u>. The Company acknowledges that funds are made available to it under this Agreement in whole or in part for the purpose of economic development for the State of South Carolina and particularly for generating professional research and development jobs in South Carolina. Accordingly, the Company agrees for thereafter period of five years from the date of this Agreement, not to (a) move or relocate the Company Business or the Company's principal office or principal place of business outside the State of South Carolina, and (b) not to have more than one-half, based on payroll expenses, of the Company's total employees, or senior management employees, or employees engaged principally in professional research and development, employed at locations outside of the State of South Carolina (any of which shall be deemed a "Company Relocation"), unless the Company has paid SC Launch a Relocation Fee as set forth below.

> B. <u>Relocation fee</u>. The "Relocation Fee" will be an amount equal to the aggregate amount of all funds advanced by SC Launch to the Company. SC Launch will continue to retain any Securities or other interests it holds in the Company after payment of such fee[,] and this Agreement will continue in full force and effect. The parties acknowledge that the costs to SC Launch, including both tangible and intangible costs, of a Company

Relocation are not susceptible to precise measurement. The parties hereby agree that the Relocation Fee is not a penalty, but rather, a good-faith estimate of the amount necessary to compensate SC Launch for its actual costs in connection with a Company Relocation.

        C.     Costs and fees.  Should SC Launch, at its sole option, elect to employ the services of any attorney at law to represent it in the enforcement of the Company's obligations under this Section 3.3, the Company will reimburse SC Launch the reasonable fees and expenses of said attorneys and any court costs.

Further, section 7.10, which governs termination of the Financing Agreement, states,

Except as otherwise specifically provided herein, the provisions hereof, including all covenants, shall continue in full force and effect until the repurchase or redemption by the Company of all securities of the Company held by SC Launch or its successors or assigns, and *payment of fees, including the Relocation Fee to the extent applicable*, and performance of all other obligations owed SC Launch hereunder.

(emphasis added).

In its Supplemental Complaint dated April 27, 2015, Dannar admitted that as of April 1, 2015, it had "relocated a majority of its assets and inventory from South Carolina to Indiana."  Dannar also admitted that it had "hired two employees in Indiana and retained one employee in South Carolina."  Because Dannar took these actions on or before April 1, 2015—over a year before the April 14, 2016 expiration of the five-year prohibition on relocation—Dannar was obligated to pay the relocation fee in accordance with section 3.3 of the Financing Agreement.  Further, section 7.10 states that the Financing Agreement continues in full force and effect until Dannar (1) pays all fees, including the relocation fee, (2) repurchases or redeems all of the company's securities held by SCL, and (3) performs all other obligations owed to SCL.  Therefore, we affirm the circuit court's conclusion that Dannar's repayment of the Note did not extinguish its remaining obligations under the Financing Agreement.

## II.    Penalty

Appellant asserts the circuit court erred by concluding that the relocation fee referenced in the Financing Agreement was not an unenforceable penalty.  We disagree.

The circuit court concluded that within the context of SCL's funding of high-risk startups with tax-incentivized contributions and its mentoring services, the Relocation Fee was reasonable:

> Given the context and the relationship of the parties at issue, SC Launch disputes that the traditional law pertaining to whether a liquidated damages provision constitutes an unenforceable penalty applies to this situation.  People or entities providing financing and services to a high risk, start-up business normally insist on receiving substantial equity in the company, seats on the board of directors, involvement in management, and other valuable consideration.  *SC Launch's request for a commitment to remain in this State for five years or pay a fee in order to obtain state tax incentivized funds and services is modest consideration in this context*, and this situation is differ[ent] in character from the liquidated damages provisions often seen in construction and other commercial contracts that are analyzed by the courts as to whether they constitute an unenforceable penalty.  This context and relationship is important, but I need not reach this issue because, even applying traditional liquidated damages law in this case, I conclude that the Relocation Provision is valid and enforceable.

(emphasis added).  The circuit court also concluded that the costs involved with mentoring a client such as Dannar and the costs of lost jobs, wages, and tax revenues resulting from a client's premature relocation justified SCL's inclusion of the Relocation Provision in the Financing Agreement.

We disagree with SCL's argument that the Relocation Provision is not subject to the traditional liquidated damages analysis.  Nonetheless, we believe the Relocation Provision is enforceable under this analysis. "South Carolina law allows parties to prospectively set an amount of damages for breach through the inclusion

of a liquidated damages provision." *ERIE Ins. Co. v. Winter Constr. Co.*, 393 S.C. 455, 460, 713 S.E.2d 318, 321 (Ct. App. 2011). "The question of whether a sum stipulated to be paid upon breach of a contract is liquidated damages or a penalty is one of construction and is generally determined by the intention of the parties." *Moser v. Gosnell*, 334 S.C. 425, 431, 513 S.E.2d 123, 126 (Ct. App. 1999). "The determination does not necessarily depend upon the language used in the contract." *Id.* "Rather, the determination depends upon the nature of the contract in light of the circumstances, and the attitude and intentions of the parties." *Id.*

Specifically,

> whe[n] the sum stipulated is reasonably intended by the parties as the predetermined measure of compensation for actual damages that might be sustained by reason of nonperformance, the stipulation is for liquidated damages; and whe[n] the stipulation is not based upon actual damages in the contemplation of the parties, but is intended to provide punishment for breach of the contract, the sum stipulated is a penalty.

*ERIE*, 393 S.C. at 460–61, 713 S.E.2d at 321 (quoting *Tate v. Le Master*, 231 S.C. 429, 441, 99 S.E.2d 39, 45–46 (1957)). Further,

> [i]n order to determine whether the sum named in a contract as a forfeiture for noncompliance is intended as a penalty or liquidated damages, *it is necessary to look at the whole contract, its subject-matter, the ease or difficulty in measuring the breach in damages and the magnitude of the stipulated sum*, not only as compared with the value of the subject of the contract, but in proportion to the probable consequences of the breach.

*Id.* at 462, 713 S.E.2d at 322 (emphasis added) (quoting *Foster v. Roach*, 119 S.C. 102, 107, 111 S.E. 897, 899 (1922)).

"Whe[n] . . . the sum stipulated is plainly disproportionate to any probable damage resulting from breach of contract, the stipulation is an unenforceable penalty." *Foreign Acad. & Cultural Exch. Servs., Inc. v. Tripon*, 394 S.C. 197, 204, 715 S.E.2d 331, 334 (2011) (quoting *Lewis v. Premium Inv. Corp.*, 351 S.C. 167, 172, 568 S.E.2d 361, 363 (2002)). This is so despite the characterization the

stipulated sum is given in the contract language itself. *See Benya v. Gamble*, 282 S.C. 624, 630, 321 S.E.2d 57, 61 (Ct. App. 1984) ("*Irrespective of its terminology,* a stipulation will be held to constitute a penalty 'whe[n] the sum stipulated is so large that it is plainly disproportionate to any probable damage resulting from [a] breach of the contract.'" (emphasis added) (second alteration in original) (quoting *Tate*, 231 S.C. at 442, 99 S.E.2d at 46)).

However, the burden is on the party contesting the characterization set forth in the parties' contract to show that a specified sum is actually a penalty. *See Rental Unif. Serv. of Greenville, S.C., Inc. v. K & M Tool & Die, Inc.*, 292 S.C. 571, 573, 357 S.E.2d 722, 724 (Ct. App. 1987) (noting that the contract being examined by the court expressly stated that the provision was for "liquidated damages" and acknowledging that although the designation was "not necessarily conclusive of the issue of whether the sum specified in the contract is either liquidated damages or a penalty, the designation is indicative of the intention of the parties and must be accepted as the true expression of their intention *until it is shown that the provision is for a penalty*." (emphasis added) (citation omitted)); *see also Ellie, Inc. v. Miccichi*, 358 S.C. 78, 93, 594 S.E.2d 485, 493 (Ct. App. 2004) ("Whe[n] an agreement is clear and capable of legal interpretation, the court's only function is to interpret its lawful meaning, discover the intention of the parties as found within the agreement, and give effect to it." (quoting *Heins v. Heins*, 344 S.C. 146, 158, 543 S.E.2d 224, 230 (Ct. App. 2001)).

Moreover, "[w]here there is no evidence [that] enables the court to find the amount of damages anticipated by the parties, it cannot say that a provision is for a penalty rather than for liquidated damages *by reason of the fact that the amount is disproportionate to the actual damages*." *Benya*, 282 S.C. at 631, 321 S.E.2d at 62 (emphasis added) (quoting 25 C.J.S. *Damages* § 108 at 1057 (1966)). Finally, even "[i]f a clause is held to be a penalty, the plaintiff may still recover any actual damages that can be proved to have resulted from the breach." *Tripon*, 394 S.C. at 204, 715 S.E.2d at 334.

Here, we acknowledge that at first glance, the relocation fee ($200,000) seems excessive when compared to the amount of the loan ($200,000), which Dannar fully repaid with interest. We further acknowledge the admission of SCL's executive director, Harry Hillman, that as a general rule, it was SCL's practice to set the relocation fee at the same amount as the principal amount of the loan. However, the very essence of the contract was SCL's objective to create high-paying jobs for South

Carolinians and to further develop South Carolina's economy.[4]  Section 3.3.A of the Financing Agreement begins with Dannar's acknowledgement that SCL was making the loan "for the purpose of economic development for the State of South Carolina and particularly for generating professional research and development jobs in South Carolina."  Consistent with this language, SCL's damages included the lost opportunity to fund another startup that would stay in South Carolina long enough to provide high-paying jobs for South Carolina residents, grow the tax base, and strengthen the state's knowledge economy.  The very nature of this lost opportunity makes it difficult to monetize, but we conclude the cost would far exceed the amount of the relocation fee, $200,000.

Further, section 3.3.B of the Financing Agreement begins with notice to Dannar that the relocation fee will "be an amount equal to the aggregate amount of all funds advanced by SC Launch to the Company."  This section also states,

> SC Launch will continue to retain any Securities or other interests it holds in the Company after payment of such fee[,] and this Agreement will continue in full force and effect.  The parties acknowledge that the costs to SC Launch, including both tangible and intangible costs, of a Company Relocation are not susceptible to precise measurement.  The parties hereby agree that the Relocation Fee is not a penalty, but rather, a *good-faith estimate of the amount necessary to compensate SC Launch for its actual costs in connection with a Company Relocation.*

(emphasis added).  According to Hillman, the Relocation Provision and relocation fee are standard provisions in every financing agreement with its respective client companies, and these provisions are critical to the continued success of the SCL

---

[4] We reject Appellant's argument that the state's loss of jobs resulting from a loan recipient's relocation is not a loss to SCL.  Although SCL is a non-profit corporation, we view it as an extension of state government with a mission to carry out SCRA's enabling legislation.  SCRA is a government agency established by our legislature to, *inter alia*, promote the development of high technology industries and research facilities in South Carolina pursuant to specific legislation,  §§ 13-17-10, -20.  SCRA formed the SC Launch program to, *inter alia*, strengthen South Carolina's knowledge economy and create high-paying jobs in the state, and the program supports advanced technology and knowledge-based businesses.  *See supra* pp. 2–3.

program. When a business supported by SCL departs South Carolina before making any significant economic impact on the state, SCL loses the benefit of its bargain, the expected high-paying jobs, resulting tax revenue, and additional benefits to the local economy.

Accordingly, when Dannar relocated to Indiana well before the expiration of the requisite five-year period, SCL lost the benefit of its bargain with Dannar. In contrast, Mr. Dannar acknowledged that his company "would not be moving forward were it not for the support of and investment made by [SCL]." This is a testament to SCL's distinction from traditional private lenders. To successfully carry out its mission to create high-paying jobs in the state, SCL provides loans to high-risk startups who may be initially unsuccessful in obtaining other financing, as was the case with Dannar, and provides the services of its staff members to mentor clients and make local contacts on behalf of their clients.

Notably, Dannar itself, having accepted financing and mentoring services from SCL, projected the benefits that its business would provide to Indiana (rather than South Carolina). In its December 15, 2012 funding application submitted to the State of Indiana, Dannar projected a $1.2 million corporate tax liability by the year 2015 in favor of Indiana. Therefore, according to Dannar's own numbers, the tax revenues South Carolina would have lost to Indiana before the expiration of the five-year relocation prohibition dwarfs the amount of the Relocation Fee, $200,000. Ironically, during the July 23, 2013 meeting concerning the Redevelopment Agreement between Dannar and Delaware County, Indiana, a member of Delaware County Council asked Mr. Dannar about the Relocation Fee in the Financing Agreement with SCL. Specifically, the member asked if Dannar would be prepared to pay the Relocation Fee to SCL, and Mr. Dannar replied, "Yes, we would be prepared to pay that back."

We note that the circuit court and SCL have relied on an opinion of the Supreme Court of Iowa in a comparable case, *City of Davenport v. Shewry Corp.*, 674 N.W.2d 79 (Iowa 2004). In *Shewry*, the City of Davenport entered into an economic development agreement with a welding company contemplating the company's building of a welding and fabrication facility, creating 60 new full-time jobs within 36 months, and retaining 186 existing jobs. *Id.* at 81. In return, the City agreed to provide up to $200,000 in grant money to the company in three phases, which were aligned with the company's progress on building the facility. *Id.* The agreement stated that the company's failure to meet the employment requirements would constitute a material breach of the agreement requiring repayment of all grant funds received. *Id.* When the company failed to meet the agreement's employment

requirements, the City filed an action seeking to recoup $150,000 in grant funds it had distributed to the company, and the trial court ultimately entered a $150,000 judgment against the company. *Id.* at 82. On appeal, the Supreme Court of Iowa affirmed the trial court's ruling that the agreement's requirement for the return of grant funds upon a material breach was not an unenforceable penalty. *Id.* at 86.

Dannar distinguishes *Shewry* on the basis that in the present case, SCL issued an interest-bearing loan that Dannar fully repaid. However, we believe this distinction is immaterial for purposes of examining the *Shewry* court's analysis of whether the disputed clause was a penalty or merely a liquidated damages clause. Like South Carolina, Iowa considers (1) whether the clause sets an amount that is unreasonably large in light of the anticipated or actual loss and (2) the difficulty of proving the loss. *Shewry*, 674 N.W.2d at 85.[5] In particular, the court stated, "The defendants' claim that the repayment provision is a penalty rests on their erroneous assumption that the City's only loss is the grant money paid to the company." *Id.* The court explained,

> This assumption ignores the fact that the [agreement] expressly recognized *two* anticipated benefits to the City from the company's performance of its contractual obligations: (1) an increased tax base; and (2) *the creation of jobs*. Although damages from a failure to realize the first benefit may be easily computed, the City's loss from the company's failure to create the jobs required by the

---

[5] The *Shewry* court noted that it had adopted the two-factor test set forth in the Restatement (Second) of Contracts § 356(1), cmt. b, for determining whether a purported liquidated damages provision is actually a penalty: "(1) 'the anticipated or actual loss caused by the breach'; and (2) 'the difficulty of proof of loss.'" 674 N.W.2d at 85 (quoting *Rohlin Constr. Co. v. City of Hinton*, 476 N.W.2d 78, 80 (Iowa 1991)). Although we have found no opinions of our own supreme court expressly adopting this provision of the Restatement or its comment, this court has expressly relied on it. *See Baugh v. Columbia Heart Clinic, P.A.*, 402 S.C. 1, 27, 738 S.E.2d 480, 494 (Ct. App. 2013) ("To the extent that there is uncertainty as to the harm, the estimate of the court or jury may not accord with the principle of compensation any more than does the advance estimate of the parties." (quoting Restatement (Second) of Contracts § 356 cmt. b)); *id.* ("The greater the difficulty either of proving that loss has occurred or of establishing its amount with the requisite certainty, the easier it is to show that the amount fixed is reasonable." (quoting Restatement (Second) of Contracts § 356 cmt. b)).

[agreement] is difficult, if not impossible, to measure. New workers earn payroll dollars that are spent in the community, generating income for other residents who then spend their earnings, and so on. We conclude *the City would have great difficulty in establishing with any degree of certainty the loss it has sustained from the company's breach of the [agreement]*.

*Id.* (second and third emphases added). The court also concluded that the amount of liquidated damages fixed in the agreement, which was the same as the amount of grant funds issued, was not unreasonably large in light of the anticipated or actual harm because the repayment of those funds would not cover the damages resulting from the loss of anticipated jobs. *Id.* at 85–86. We find the *Shewry* court's analysis persuasive.

Dannar maintains that the "value of uncreated jobs in South Carolina is speculative at best." Yet, the speculative nature of placing a value on lost jobs only validates the language in the Relocation Provision acknowledging that the costs to SCL of a company relocation are not susceptible to precise measurement and the specified $200,000 fee is a good-faith estimate of those costs. This is a factor courts consider when upholding a liquidated damages provision. *See Baugh*, 402 S.C. at 26, 738 S.E.2d at 494 (upholding a stipulated damages provision in a covenant not to compete and acknowledging, "the damages to be expected by competition are highly difficult to predict"); *id.* at 27, 738 S.E.2d at 494 ("To the extent that there is uncertainty as to the harm, the estimate of the court or jury may not accord with the principle of compensation any more than does the advance estimate of the parties." (quoting Restatement (Second) of Contracts § 356 cmt. b)); *id.* ("The greater the difficulty either of proving that loss has occurred or of establishing its amount with the requisite certainty, the easier it is to show that the amount fixed is reasonable." (quoting Restatement (Second) of Contracts § 356 cmt. b)).

In any event, we note that SCRA's 2015 Annual Report on SC Launch indicates the average salary of the jobs created through the SC Launch program was $69,000. Using this number, the loss of merely three jobs would cost SCL, as a representative of the state, at least $207,000 in generated salaries, more than the $200,000 relocation fee imposed by SCL on Dannar.

Finally, Dannar highlights Hillman's admission that he "probably" referred to the Relocation Fee as a penalty or a "clawback" at some point in the past. Dannar also highlights similar references in meeting minutes and other correspondence of

SCL's Board of Directors. However, these particular references are not relevant to the parties' intent at the time they executed the Financing Agreement. No date is indicated for Hillman's probable references, and the references in meeting minutes took place years after the Financing Agreement was executed. Therefore, none of these references may be considered in determining the parties' intent underlying their agreement on the relocation fee. *See Klutts Resort Realty, Inc. v. Down'Round Dev. Corp.*, 268 S.C. 80, 89, 232 S.E.2d 20, 25 (1977) ("The purpose of all rules of contract construction is to determine the parties' intention. The courts, in attempting to ascertain this intention, will endeavor to determine the situation of the parties, as well as their purposes, *at the time the contract was entered into*. The court should put itself, as best it can, in the same position occupied by the parties *when they made the contract*. In doing so, the court is able to avail itself of *the same light [that] the parties possessed when the agreement was entered into* so that it may judge the meaning of the words and the correct application of the language." (emphases added) (citation omitted)); *U.S. Bank Tr. Nat'l Ass'n v. Bell*, 385 S.C. 364, 374, 684 S.E.2d 199, 205 (Ct. App. 2009) ("To give effect to the parties' intentions, the court will endeavor to determine the situation of the parties and their purposes *at the time the contract was entered*." (emphasis added)); *Ellie*, 358 S.C. at 94, 594 S.E.2d at 493 ("In ascertaining intent, the court will strive to discover the situation of the parties, along with their purposes *at the time the contract was entered*." (emphasis added)).

Based on the foregoing, we affirm the circuit court's conclusion that the Relocation Provision's fee requirement was not a penalty.

## CONCLUSION

Accordingly, we affirm the circuit court's order.

**AFFIRMED.**[6]

**LOCKEMY, C.J., and HEWITT, J., concur.**

---

[6] We decide this case without oral argument pursuant to Rule 215, SCACR.